STATE of Minnesota, Respondent,

v.

Mark Orlando HARRIS, Appellant.

No. C8–96–66.

Supreme Court of Minnesota.

Feb. 27, 1997.

Linda Jenny, Minneapolis, Hubert H. Humphrey, III, Attorney General, St. Paul, for Respondent.

Rochelle R. Winn, Assistant State Public Defender, Minneapolis, for Appellant.

## OPINION

GARDEBRING, Justice.

This is an appeal from a conviction for first-degree murder in the death of Carol Abelseth, whose body was found on July 15, 1992, in north Minneapolis. Defendant Mark Orlando Harris was charged with her murder and tried before a jury in Hennepin County in early 1993. Specifically, he was charged with murder while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence. Minn.Stat. § 609.185(2) (1992). He was convicted and appealed that verdict to this court. We reversed and ordered a new trial, concluding that misconduct by the prosecutor and the improper admission of certain evidence denied Harris a fair trial. *State v. Harris*, 521 N.W.2d 348 (Minn.1994). Harris then moved to have the indictment dismissed, on the grounds that to try him a second time would violate the double jeopardy clauses of the federal and state constitutions. The trial court denied the motion, and Harris again appealed. We affirmed the trial court's decision. *State v. Harris*, 533 N.W.2d 35, 36 (Minn.1995). Harris was then tried and convicted a second time before a Hennepin County jury. This is an appeal from that second conviction. Harris raises three evidentiary issues: (1) that evidence he abused his former girlfriend should not have been admitted because it was improper other crimes evidence and its probative value was substantially outweighed by its prejudicial effect; (2) that a story and secret code written by Harris should not have been admitted because it was highly prejudicial; and (3) that evidence tending to incriminate another suspect was improperly excluded. We affirm.

Carol Abelseth's body was found in Basset Creek Park in the early morning hours of July 15, 1992. The medical examiner determined that the cause of death was blunt force trauma to the left side of her head. In addition, there was evidence that Abelseth had been sexually assaulted. Abelseth had spent the evening of July 14, 1992, barhop-ping with friends in south Minneapolis, ending up at Knicker's Bar at Lake Street and Lyndale Avenue. She was last seen by one witness getting into Harris's car some time after the bar closed at 1:00 a.m.

As part of its case in chief, the state called Lois Vazquez, Harris's former girlfriend, who was living with Harris at the time of the Abelseth murder. Vazquez testified that she was awakened by Harris when he arrived home at about 2:45 a.m. on July 15, 1992. She described that he was frantic and that he had blood on his hands, shorts, and shoes. She stated that he explained that he and his friends had picked up a rival gang member, beaten him up, and dumped him somewhere.

According to her testimony, Vazquez followed Harris out to the car, where he began wiping down the dashboard and steering wheel. He pulled a large roll of plastic out of the car, tore off a few feet and set it on fire. The two then went inside and attempted to wash Harris's clothes and shoes. Vazquez testified that over the next couple of days, she disposed of the bloody shoes and shirt.

Vazquez also testified that she began to suspect that Harris had not told her the truth about what happened that night when she received a call a few days later from Eric Paine, who had been arrested for Abelseth's murder.[1] Paine told Vazquez of his arrest and asked that Harris come to the police station to explain that Abelseth had gotten into Harris's car and not Paine's car.

According to her testimony, Vazquez cleaned the car inside and out, shortly after talking to Paine. She testified that she tried not to clean it too thoroughly in order to avoid looking suspicious. When the police came to her home, she lied and told them that Harris had come home earlier than he actually had in the early morning of July 15th. When asked for the clothes he had been wearing that night, she gave them different clothes. After the police left, she got rid of the roll of plastic.

---

1. The police had initially arrested Eric Paine, but released him when several witnesses came for-ward to provide him with an alibi.

Vazquez also testified that Harris eventually confessed to her about killing Abelseth. Specifically, she stated:

[H]e told me they were out, had gotten out of the car, and she told him that she was going to call the police, and he lost it, and there was something laying on the ground and he picked it up and didn't realize what he was doing and beat her.

Vazquez had testified at Harris's first trial. At that trial, she gave completely different testimony from that offered at this second trial. In the first trial, Vazquez testified that Harris had come home at about 2:00 a.m. She did not say anything about him being agitated or about him cleaning out the car and attempting to wash his clothes. She stated that she washed her car as part of her usual routine. She also stated that Harris had not said anything to her about the events of July 14, 1992.

To explain why Vazquez changed her testimony so dramatically from one trial to the next, the state sought to introduce evidence that Harris routinely beat Vazquez during the course of their relationship. The state provided notice of its intent to introduce evidence of thirteen specific incidents of abuse. During an in camera hearing, the trial court required the state to prove each incident by clear and convincing evidence and found that the state met that burden. Further, the court found that the evidence was necessary to the state's case. Finally, the court concluded that the purpose for which the evidence was used—bolstering the credibility of Vazquez—was legitimate.

The court did limit the amount of testimony, however, concluding that to admit more than six incidents would allow the prejudicial effect to outweigh the probative value. The court admitted certain corroborating evidence, including medical records and photographs of Vazquez's injuries, finding that they *corroborated her testimony and were* helpful to the jury. Immediately prior to the testimony, the court gave a limiting instruction, admonishing the jury to consider this testimony only for the purpose of assessing Vazquez's credibility.

Vazquez testified that the beatings started less than a month into their relationship and continued throughout the relationship and that on many occasions Harris demanded that she call him "Daddy." She estimated that he had beaten her on about 20 occasions. The evidence admitted relating to the six specific incidents was as follows:

— On the Fourth of July weekend, 1991, Vazquez was at a bar playing pool with a friend. Harris came in and wanted Vazquez to leave, and when she refused, he hit her in the face. After they left, he beat her several times, while driving around in the car over the course of several hours. She received two black eyes and a cut on her face from the ring he was wearing.

— On August 13, 1991, Harris and a friend broke into Vazquez's house. While the friend waited upstairs, Harris took Vazquez downstairs and proceeded to beat her "really, really, really bad" for hours. He avoided hitting her in the face because her mother was in town. As they were walking back up the stairs, he hit her again in the back. When he left the house, he took the telephone and locked Vazquez and her children inside. Vazquez had her oldest son crawl out of the house through a window and go to a neighbor's home to get help. The ambulance drivers had to pull her out of the house through a window. Medical records from this hospital visit were introduced into evidence. In addition, an x-ray report taken in October 1991 after another beating incident was also entered into evidence. That report described old injuries to Vazquez's ribs, which appeared to be caused by the August 13 incident.

— On August 28, 1991, Harris picked up Vazquez at a bar where she had been drinking. He was accompanied by a friend. Outside, Harris punched Vazquez; she fell and split her head open on the pavement, requiring stitches. He then ordered Vazquez and the friend into the car. As they were driving away, they were stopped by police. Vazquez told the police

what happened and eventually obtained a restraining order. She quickly requested that the order be dissolved, however, because it made Harris more angry. Harris was charged with a misdemeanor for this incident and pled guilty. Photographs of Vazquez's injuries and the medical records from this incident were entered into evidence, as were copies of the restraining order, the order dissolving the restraining order, and Vazquez's petitions to obtain and then dissolve the restraining order.

— During the winter of either 1991 or 1992, Vazquez and Harris had been out to a restaurant one evening. On the way home, Vazquez was afraid because she thought Harris was driving too fast for the road conditions. When she asked him to slow down, he "seemed to go crazy." He drove her car into the snowbank and then forced her to try and get it out. After another driver helped them get it out, Harris forced her to drive while verbally harassing her. He threw some clothes from the back seat out the window, made her gather them up, and then set them on fire. He hit her in the face, knocking off her glasses, and then picked up the glasses and crumpled them. He then forced her to drive without her glasses. Vazquez eventually was able to stop at a motel and call the police. A piece of Vazquez's crumpled glasses was introduced into evidence at the trial.

— On June 7, 1992, Harris and Vazquez were playing pool when Harris "just hauled off and hit" her with his cue, hitting her on the side. He hit her a second time, catching her arm and injuring it. A medical report detailing Vazquez's injuries from this incident was entered into evidence.

— Finally, Vazquez testified that Harris raped her. Harris had picked her up at a bar, where he had seen another man leaning over to talk to her. When they got home, he took her downstairs, raped her anally, and made her pretend to enjoy it.

Vazquez testified that she lied about the abuse and her injuries on several occasions. She also noted that Harris became particularly enraged when she threatened to contact the police.

Also during its case in chief, the state introduced a story, entitled "The Lady and the Snake," that Harris had written and given to Vazquez sometime before the murder. Prior to its introduction, the court gave the jury a limiting instruction, again admonishing them to use the evidence only to assess Vazquez's credibility. To save time, the court had the state's attorney read the story out loud:

> This is the story of the lady and the snake. Many years ago a lady, a white lady, who was a humanitarian, found a snake int he (sic) gutter who was half frozen, half starved, and half dead. She picked up the snake and took it home where she nursed it back to proper health. Over the years this snake and the lady grew overly fond of each other. Everyday they would retire on the carpet in front of the fireplace where it would stretch out while she stroked its back from head to its tail. He loved this treatment, and then one day, while her mind was absent from what she was doing, she stroked him from the tail towards his head. He drew back and sunk his poisonous fangs into her flesh. She fell to the carpet beside him, dying, but managed to ask, "How could you do this to me, of all people?" The snake looked into her dying eyes and said, "It was easy. You stroked me the wrong way, forgetting that I am still a snake." End of story. * * *

The state also introduced a code that Harris had developed and given to Vazquez while he was in jail. Vazquez stated that Harris had asked her to learn the code in case they ever needed to use it, but that they never actually used the code to communicate.

The state relied upon other significant evidence as part of its case against Harris. DNA tests of sperm found on Abelseth's shirt matched DNA samples taken from Harris. A police search of Harris's car produced spots of unidentified human blood on the back rear window and hair matching Abel-

seth's on the rear floor. In addition, fibers found on Abelseth's body matched those from carpeting in Harris's car. Abelseth's purse was found alongside a freeway that was on Harris's route between Basset Creek Park, where Abelseth's body was found, and his home. Finally, Abelseth had injuries on her face, the shape and texture of which bore a striking resemblance to the surface of a ring seized from Harris.

At the trial, Harris's theory was that another person, Eric Paine, had in fact committed the murder and that there was insufficient credible evidence connecting Harris to the murder. Harris testified in his own defense. He claimed that he and Abelseth had an ongoing casual sexual relationship for many months prior to her death. He testified that on the night of her murder at about 10:20 p.m., they had sex in his car, and he ejaculated on her shirt. He said that he last saw Abelseth talking to Eric Paine when he drove by Knicker's Bar on his way home, sometime after 1:00 a.m.

■ Harris first challenges the admission of the abuse testimony and corroborating documents. He claims that it was an improper use of other crimes evidence and that its probative value was substantially outweighed by the risk of unfair prejudice. We review trial court decisions on the admission of evidence under an abuse of discretion standard that is deferential to the trial court. *State v. Naylor,* 474 N.W.2d 314, 317 (Minn. 1991).

■ Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. Minn.R.Evid. 404(b). It may, however, be admissible for other purposes such as proof of motive, opportuni-

ty, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.; see also State v. Spreigl,* 272 Minn. 488, 491, 139 N.W.2d 167, 169 (1965). In other words, "other crime evidence is not admissible for the purpose of establishing that the defendant is of 'bad character' because he or she committed the prior crime and therefore has a general propensity to commit other crimes." *State v. Bolte,* 530 N.W.2d 191, 196 (Minn.1995). Thus, if the only purpose of the evidence is to demonstrate the defendant's propensity to commit bad acts, it should be excluded, but if the evidence has another legitimate purpose, it may be admitted. *State v. Wermerskirchen,* 497 N.W.2d 235, 239–40 (Minn.1993).

■ Bolstering or rehabilitating the credibility of a witness is not one of the exceptions specifically identified in Rule 404(b), which enumerates certain allowable uses of "other crimes" evidence. This list of acceptable purposes, however, is not meant to be exclusive. Minn.R.Evid. 404, cmt. We are persuaded that the limited purpose for which the domestic abuse evidence was introduced in this case was proper under Rule 404(b).[2] The abuse testimony demonstrated the degree of control exercised by Harris over Vazquez and provided an explanation for her willingness to perjure herself on his behalf at the first trial. It was particularly important in light of the damaging testimony she gave—that she destroyed evidence, helped wash Harris's clothing, cleaned the car even after she suspected that her boyfriend had murdered another woman, lied to the police, and committed perjury at the grand jury hearing and at the first trial. *See People v. Steinberg,* 170 A.D.2d 50, 72–75, 573 N.Y.S.2d 965, 978–80 (N.Y.App.Div.1991) (ev-

---

2. While this kind of rehabilitative evidence normally should only come in on redirect examination, after the witness's credibility has been attacked, *see* Minn.R.Evid. 608, we note that in this case, there was no question whether the defense would use Vazquez's prior inconsistent statements to impeach her: the defense began attacking Vazquez's credibility in its opening statement. During his opening statement, after admitting that Harris had physically abused Vazquez, defense counsel suggested that Vazquez might have changed her story to the present version to ensure that Harris would go to jail:

[C]onsider the hatred, the vengeance, and the fear that may motivate that woman * * * to do whatever she can to make sure that she never has to worry about Mark Harris again, even if it's getting up on that witness stand and telling you now something that is not true.

Given this certainty, we find that it was not an abuse of discretion to allow the domestic abuse testimony to be introduced during the prosecution's case in chief.

idence of domestic abuse was admissible to give credibility to wife's testimony, where testimony without explanation of abusive situation would have been unbelievable); *State v. Axford*, 417 N.W.2d 88, 89–93 (Minn.1987) (admission of similar prior crimes against same victim by defendant's son was admissible to explain why complaining witness delayed in reporting the sex abuse); *Arcoren v. United States*, 929 F.2d 1235, 1238–41 (8th Cir.1991) (expert testimony regarding domestic abuse was admissible to explain why the defendant's wife completely changed her story).

■ Our analysis does not end here, however. We must also determine whether the evidence was unduly prejudicial. Evidence should be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. Minn.R.Evid. 403. Clearly, the testimony here had probative value. It explained why Vazquez lied to the police and committed perjury at the first trial. Her credibility was an issue for the jury to assess, and it mattered in the determination of the overall question of Harris's guilt.

Thus, the question is whether the potential for unfair prejudice substantially outweighed the probative value. "Prejudice" means only the "unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Townsend*, 546 N.W.2d 292, 296 (Minn.1996) (quoting *State v. Cermak*, 365 N.W.2d 243, 247 n. 2 (Minn. 1985)). Here, the evidence does not appear to be overly inflammatory or likely to emotionally charge the jury. The testimony was given in a straightforward manner, without an overemphasis on the graphic details. The direct examination of Vazquez on the abuse issue took only a portion of a morning. While the photographs and medical records were admitted to corroborate the testimony, the bruises and broken bones of Vazquez were not likely to be overly prejudicial in light of the other graphic evidence the jury was exposed to during the course of this trial, especially the autopsy photos.

Harris also objects to the volume, degree of detail, and the admission of corroborating medical records and photographs. Instead, he argues, Vazquez should only have been able to say "I lied because he beat me," or something similarly vague. We disagree. Given the degree to which Vazquez changed her testimony, and the extent to which she lied and covered up for the defendant, the details of his abuse and controlling behavior were necessary.

Central to our decision is the fact that the trial court took great care in limiting the testimony so as to minimize the potential for unfair prejudice. The court followed *Spreigl* procedures for admitting the evidence by requiring notice of the intent to introduce the evidence. *See Spreigl*, 272 Minn. at 496–97, 139 N.W.2d at 173; *State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967); Minn.R.Crim.P. 7.02. Further, during an in camera hearing at which Vazquez testified, the court required the prosecution to demonstrate that it could prove the prior acts by clear and convincing evidence. The court also concluded that the evidence was necessary to the state's case. *See Billstrom*, 276 Minn. at 178–79, 149 N.W.2d at 284–85.

In addition, the court limited the amount of testimony to six specific incidents, when the state had sought to elicit testimony on many more, and the court eliminated certain references to other crimes and gang affiliations that had no relevance to Vazquez's credibility. Finally, the court gave limiting instructions both before the testimony was presented and in the final charge, admonishing the jury to consider the abuse testimony only in assessing the witness's credibility. Because the trial court so carefully limited the testimony to reduce the risk of unfair prejudice, it was not an abuse of discretion to admit the testimony.

■ Harris next challenges the admission of a story and secret code that he wrote and gave to Vazquez. He argues that the evidence was not relevant to any issues of consequence in the case and that the risk of unfair prejudice outweighed any probative value the evidence may have had. Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the ac-

tion more probable or less probable than it would be without the evidence. Minn. R.Evid. 401. Both the story and code were admitted to corroborate Vazquez's testimony about the abuse and control in her relationship with Harris and to aid the jury in evaluating her credibility. Vazquez's credibility was an issue of consequence to the determination of the action. Therefore, these items of evidence were relevant. The risk of prejudice from the admission of these pieces of evidence was not very high, particularly in light of the other testimony that Harris abused Vazquez, including his admission of the abuse, and the other evidence and testimony connecting Harris to the murder of Abelseth.

■ Nor do we find that the admission of the story was an improper comment on Harris's character. That is different from the situation presented in *State v. Washington*, 521 N.W.2d 35, 39 (Minn.1994), in which we held that the prosecutor's use of a fable during closing arguments was an improper character attack. There, the prosecutor invoked a fable to illustrate that the defendant was likely to have committed the charged crime because that was his nature and he could not help it. *See id.* at 39. In addition, there had been no presentation of character evidence during the trial, so reference to the defendant's character was deemed improper. *Id.* Here, the story was in the defendant's own words and was not the comment of one of the attorneys. Moreover, the story had the legitimate purpose of corroborating Vazquez's testimony regarding the nature of the relationship between Harris and Vazquez.

■ Finally, Harris argues that he should have been allowed to introduce certain evidence he claims connected Eric Paine to the murder and that the exclusion of this evidence denied him a fair trial by denying the opportunity to present a complete defense. Specifically, Harris sought to introduce evidence of a confrontation between Paine and Abelseth as a result of his touching Abelseth's hair several months before her murder; evidence that Paine had an unrelated charge of first-degree criminal sexual conduct; evidence of Paine's general hostility and aggressiveness towards women, and evidence of Paine's aggressive behavior on the night of the murder and his statement the next day that he had been with a "blond cutie."

■ In a criminal trial, where the issue is whether in fact the defendant committed the crime, evidence tending to prove that another person committed the crime is admissible. *State v. Hawkins*, 260 N.W.2d 150, 158 (Minn.1977). The exclusion of such evidence may require a new trial where the evidence is crucial to the presentation of a complete defense. *Id.* at 160. The purpose of the evidence is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant. *Id.* at 158–59. Before such testimony may be admitted, however, a proper foundation must be laid, to avoid the consideration of matters collateral to the crime. *Id.* at 159. This foundation must include evidence having an " 'inherent tendency to connect such other person with the actual commission of the crime.' That is, evidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime." *Id.* at 159 (quoting *Marrone v. State*, 359 P.2d 969, 984 (Alaska 1961)).

In *Hawkins*, we held that it was error to exclude evidence connecting a third party to the crime because sufficient foundation was laid to introduce evidence tending to implicate the third party. *Id.* at 160. In that case, the third person's own testimony placed him at the scene of the crime. *Id.* Most importantly, however, the third person was the state's key witness—without him, no conviction could have been had. *Id.*

Mere presence in the general area of the crime has been held to be an insufficient foundation for admitting such evidence. *State v. Fenney*, 448 N.W.2d 54, 62 (Minn. 1989). Similarly, where the third parties had an alibi for the time of the crime and were not the sole witnesses against the defendant, this court held that there could not be a sufficient connection to the crime to warrant introduction of collateral matters regarding those third parties. *State v. Gustafson*, 379 N.W.2d 81, 84 (Minn.1985).

Here, we conclude that the trial court correctly excluded the specific items of evidence regarding Paine because Harris failed to es-

tablish a sufficient foundation. Without a foundation of evidence tending to connect Paine to the murder, it cannot be said that the evidence was crucial to the presentation of a proper defense and the exclusion of the evidence therefore did not deprive Harris of a fair trial. The only direct connection between Paine and Abelseth on the night of her murder was that witnesses saw them talking outside of a bar after closing. While Paine was the person who first pointed the police to Harris, he was not the state's key witness at trial. In fact, he did not testify at the second trial at all. Most important, however, is that Paine had an alibi for the time of the killing: three different witnesses testified that they were with Paine during the early morning hours of July 15, 1992. Because the evidence connecting Paine to the murder was not strong, this evidence was properly excluded.

Moreover, we note that Harris was able to introduce evidence on some of the issues concerning Paine anyway. He introduced some evidence of Paine's general hostility to women and his hostility to them on the night of the killing. Specifically, evidence was introduced that Paine had acted aggressively toward another woman in the Knicker's parking lot, just before he was seen talking to Abelseth. Another witness said he saw Paine arguing with and then slap a blond woman outside of Knicker's shortly after closing.

There was also testimony that Paine initially lied to police about ever having been at Knicker's. He only pointed the finger at Harris after being informed that Paine himself was being arrested for Abelseth's murder. The police admitted that Paine's car was never subject to the intense scrutiny that might have yielded hair or fiber evidence, nor were fiber tests conducted on Paine or his clothing. The location of Abelseth's purse was also along Paine's route home. Moreover, the only witness to actually see Abelseth get into Harris's car initially lied to police about knowing her. This witness was also a friend of Paine's and one of his alibi witnesses.

Testimony showed that a stain in the crotch area of Abelseth's jeans, which contained a mixture of semen and blood, was not suitable for DNA testing, but other tests on this stain did not eliminate Paine or Harris as possible sources. Paine's girlfriend, one of his three alibi witnesses, changed her story to the police, initially saying Paine had not been with her on the night of July 14 and then saying he was. The defendant testified that he left Abelseth and Paine standing on the sidewalk in front of Knicker's. In addition, two witnesses saw Abelseth and Paine talking in front of Knicker's at 1:45 a.m., but did not see Harris's car and claimed there was not parking for another car in front of the bar. One witness who saw Abelseth talking to Paine did not see Harris there at all. Thus, the only excluded evidence regarding Paine that Harris wished to introduce was the alleged confrontation several months before the murder between Paine and Abelseth over his touching her hair, an unrelated charge of criminal sexual conduct against Paine, other evidence of Paine's hostility to women, and Paine's statement the day after Abelseth's murder that he had been with a "blond cutie."

Because Harris was able to pursue his theory that Paine had killed Abelseth, and because there was insufficient foundation to connect Paine to the murder to allow admission of other collateral evidence, exclusion of that evidence was not error.

We affirm the trial court and hold that the admission of evidence that Harris physically abused Vazquez was properly admitted into evidence for the limited purpose of explaining why Vazquez completely changed her testimony from that given at Harris's first trial. Second, we conclude that the admission of the story and secret code written by Harris and given to Vazquez while he was in jail was not error, because this evidence was relevant, not overly prejudicial, and not improper character evidence. Finally, we conclude that collateral evidence tending to paint Paine as a criminal was properly excluded because there was insufficient evidence connecting Paine to the actual crime at issue in this case.

Affirmed.

BLATZ, J., took no part.