STATE of Minnesota, Respondent,

v.

Alfunda SCRUGGS, Appellant.

No. A11–0950.

Supreme Court of Minnesota.

Oct. 24, 2012.

634

Lori Swanson, Attorney General, St. Paul, Minnesota; and Michael O. Freeman, Hennepin County Attorney, Elizabeth Johnston, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Benjamin J. Butler, Assistant State Public Defender, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

A Hennepin County jury found appellant Alfunda Scruggs guilty of first-degree premeditated murder and second-degree intentional murder arising out of the February 4, 2010, death of Michael Fonta by strangulation. The district court entered judgment of conviction on the first-degree murder charge and imposed a life sentence without the possibility of release. In this direct appeal, Scruggs argues that the court erred in: (1) denying his motion to suppress his statement to police on the basis that it was obtained in violation of his *Miranda* rights; (2) refusing to instruct the jury that Scruggs's girlfriend, H.J., was an accomplice as a matter of law; (3) failing to instruct the jury on the aiding-and-advising theory of accomplice liability; (4) admitting evidence of Scruggs's prior assaults of H.J.; and (5) various other issues raised by Scruggs in his pro se brief. We affirm.

In the early morning of February 4, 2010, Minneapolis police responded to a 911 call reporting the discovery of a body near the rear door of a Minneapolis apartment building. The body was later identified as Michael Fonta, who was a resident of the apartment building. Initially, police interviewed several people who lived in the apartment building, including Fonta's next-door neighbor. The police also knocked on Fonta's door, but received no response. Several hours later, police knocked on Fonta's door and, after again receiving no response, attempted to enter the apartment with a key. The door was secured with a chain, and Scruggs and H.J. were in the apartment. An officer asked Scruggs and H.J. to go to the police station for questioning as witnesses. Scruggs and H.J. both agreed to the officer's request and were transported to the police station. Scruggs was released following his interview, but H.J. was arrested on an outstanding warrant for a misdemeanor trespass charge. Scruggs paid H.J.'s bail later that night.

The police executed a search warrant on Fonta's apartment and found Fonta's blood between couch cushions and behind the couch. In a dumpster behind the building, police found a set of sheets covered in Fonta's blood and a bloody sock containing Fonta's wallet. Fonta's DNA was found on an electrical cord located in the apartment.

An autopsy revealed that Fonta had been strangled, and had numerous injuries including several broken ribs and superficial stab wounds to his neck and chest. A single hair was found in Fonta's left hand, but no DNA testing was performed on the hair. Fonta's blood alcohol level was .419, and he tested positive for cocaine.

When police re-interviewed H.J. approximately one week after Fonta's death, they tried to convince her to cooperate in the investigation. She continued to deny any knowledge about Fonta's murder. The next day, however, H.J. called the police and admitted watching Scruggs kill Fonta and dispose of the evidence. She acknowledged holding the door open for Scruggs when he dragged Fonta's body outside. Police later interviewed Matthew Preston, who told them he heard Scruggs say in jail that he had beaten, strangled, and stabbed a person who he thought was sleeping with his girlfriend.

Scruggs was indicted for first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2010), and second-degree intentional murder, in violation of Minn.Stat. § 609.19, subd. 1(1) (2010). Before trial, Scruggs moved to suppress the statement he made at the police station on the day of Fonta's death because he was not given a *Miranda* warning. At the

suppression hearing, police officers testified that at the time of the interview, they did not know the location of the murder and Scruggs and H.J. were not suspects in the murder investigation. The officers testified that it was standard practice to interview important witnesses at the police station because video recording equipment is available. Both Scruggs and H.J. were told they would be brought back to the apartment after their interviews. Before leaving the apartment, the officers allowed Scruggs to put on a shirt and Scruggs brought Fonta's cell phone to the interview.

The district court denied Scruggs's motion to suppress, concluding that a reasonable person would not have believed he or she was in custody to the degree associated with arrest. Specifically, the court concluded that the police told Scruggs before and during the interview that he would be returned to the apartment to retrieve his clothing.

Additionally, the State moved to admit evidence of prior assaults Scruggs committed against H.J., and threats Scruggs made to H.J. immediately after the murder and in the days that followed. The State argued that the evidence of the threats against H.J. was relevant to explain her delay in telling the police what had happened and that the prior assaults were relevant to proving that H.J. believed Scruggs's threats. The district court allowed the State to introduce limited evidence of the threats consisting of responses to two leading questions that Scruggs "had assaulted her, and injured her in the past" and that "he was convicted of such an incident."

At trial, the State presented testimony from police and residents of the apartment building, Scruggs's statement to the police, and forensic evidence. H.J. testified that she, Scruggs, and Fonta were drinking and smoking crack together on the night of February 3, 2010. When Fonta insulted H.J. several times, Scruggs responded by punching Fonta repeatedly, kicking and kneeing Fonta in the ribs, and banging Fonta's head into the floor. H.J. told Fonta to stop antagonizing Scruggs, but Fonta did not stop, and Scruggs attacked Fonta again. When Scruggs told H.J. that they would have to keep Fonta in the apartment, she objected, and then Scruggs strangled Fonta. H.J. said she did not intervene because she had cracked ribs. After Scruggs and H.J. noticed Fonta was still moving, Scruggs stabbed Fonta in the neck and the chest. Scruggs stated to H.J.: "[w]hen I do things, I do things by myself. I don't leave no witnesses"; and the statement caused H.J. to be "scared." Thereafter, Scruggs wrapped Fonta's body in sheets and H.J. held the door open while Scruggs dragged the body outside. H.J. testified that Scruggs told her to tell the police that they last saw Fonta the previous day.

M.P., who is a convicted felon, testified that Scruggs talked to him about the murder while the two were incarcerated at the Hennepin County jail. Scruggs told M.P. that he discovered another man had been sleeping with his girlfriend, and when he confronted the man things got out of hand. Scruggs admitted to strangling the man and stabbing him in the chest and the neck, and cutting off one of his hair braids. Scruggs told M.P. he wrapped the body in sheets or towels and dragged it outside.

Scruggs testified that Fonta was his best friend and that he did not kill Fonta. He testified that, on the night in question, he was at the apartment with H.J. and Fonta was not with them. Scruggs denied telling M.P. anything about the case.

Following the trial, the jury returned guilty verdicts on both counts. The district court imposed a life sentence without

the possibility of release on the first-degree murder conviction. This direct appeal follows.

## I.

■ Scruggs argues that his statement to police was obtained in violation of his *Miranda* rights, that the district court erred in admitting it, and that the error was prejudicial. Specifically, Scruggs argues he was in custody at the time of his interrogation without being informed of his *Miranda* rights and therefore the resulting statement should have been excluded.

■ Pursuant to the Fifth Amendment, statements made by a suspect during a custodial interrogation are admissible only if the suspect was informed of his *Miranda* rights. *See Oregon v. Mathiason*, 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)). A *Miranda* warning is required if a suspect is both in custody and subject to interrogation. *State v. Thompson*, 788 N.W.2d 485, 491 (Minn. 2010). At issue is whether Scruggs was in custody when he gave his statement to the police.

■ The United States Supreme Court describes custody as a term of art to specify circumstances that present a serious danger of coercion. *Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17 (2012). Recently, we explained that an interrogation is custodial if, based on all the surrounding circumstances, a reasonable person would believe he or she was in police custody to the degree associated with formal arrest. *Thompson*, 788 N.W.2d at 491. The test is not merely "whether a reasonable person would believe he or she was not free to leave." *State v. Champion*, 533 N.W.2d 40, 43 (Minn.1995). Instead, numerous factors are considered. *See State v. Vue*, 797

N.W.2d 5, 11 (Minn.2011). Factors indicating that an individual is in custody include:

> (1) the police interviewing the suspect[ ] at the police station; (2) the suspect being told he or she is a prime suspect in a crime; (3) the police restraining the suspect[']s freedom of movement; (4) the suspect making a significantly incriminating statement; (5) the presence of multiple officers; and (6) a gun pointing at the suspect.

*Id.* (citation omitted) (internal quotation marks omitted). Conversely, factors that indicate a suspect is not in custody include:

> (1) questioning the suspect in his or her home; (2) law enforcement expressly informing the suspect that he or she is not under arrest; (3) the suspect's leaving the police station without hindrance; (4) the brevity of questioning; (5) the suspect's ability to leave at any time; (6) the existence of a nonthreatening environment; and (7) the suspect's ability to make phone calls.

*Id.* (citation omitted).

■ We review whether a defendant was in custody by applying the law to the facts found by the district court. *State v. Wiernasz*, 584 N.W.2d 1, 3 (Minn.1998). Specifically, we review the district court's findings of fact regarding the circumstances of the interrogation under the clearly erroneous standard, but we make an independent review of the district court's determinations regarding whether the defendant was in custody and the need for a *Miranda* warning. *Vue*, 797 N.W.2d at 11; *Wiernasz*, 584 N.W.2d at 3; *see also Champion*, 533 N.W.2d at 44 (stating that "[w]e give considerable, but not unlimited, deference to a [district] court's fact-specific" determination of custody).

Scruggs does not challenge the district court's factual findings. The district court

found that Scruggs was invited and that Scruggs agreed to go to the police station. When Scruggs arrived at the police station, he was escorted to an interview room at the homicide department's office in Minneapolis City Hall. Scruggs was not searched and was told to knock on the door if he wanted water or to use the restroom. Scruggs was left alone in the interview room for an hour, and the room was locked for security reasons because it opens into the homicide department's office.

During Scruggs's interview, one of the officers advised him that "[a] couple of things that [H.J.] tells us kinda don't match up with what you're telling us" and informed him of the aiding-and-abetting statute and its associated penalties. He was told that it was his best chance to tell his version of the events before charges were brought against him. One of the officers gave Scruggs his card and telephone number so that the officer could arrange to transport Scruggs to Fonta's apartment to retrieve his clothing.

All the surrounding circumstances support the conclusion that Scruggs was not in custody when he gave his statement to the police. Specifically, Scruggs voluntarily agreed to go to the police station for an interview. The police initially told Scruggs he was a witness; the police never referred to him as a suspect. The police also stated that they would return Scruggs to Fonta's apartment after the interview to collect his clothes. Scruggs had Fonta's cell phone during the interview, including while he waited in the interview room. The police did not hinder his ability to use the cell phone while he waited for the interview. Moreover, although the interview-room door was locked for security reasons, the police promptly came to the door when Scruggs knocked on the door to ask a question. Scruggs did not, at any

time, express a desire not to speak to the police or to terminate the interview. And Scruggs was allowed to leave the police station unhindered at the conclusion of the interview. Under these circumstances, a reasonable person would not believe that the locked door indicated that he was in custody to the degree associated with formal arrest. *See Vue,* 797 N.W.2d at 11–13 (holding the defendant was not in custody during an interview when he voluntarily rode to the police station in a squad car, was informed by the police that he was a suspect but that he was not under arrest, the officers told the defendant they would give him a ride home after the interview, and the police took the defendant's cell phone when he arrived at the police station and escorted him when he went to the bathroom and outside to smoke).

Scruggs focuses on several facts to support his argument that he was in custody during the interview, three of which are most significant to this case. First, Scruggs argues that the involvement of multiple officers weighs in favor of custody. *See State v. Rosse,* 478 N.W.2d 482, 486 (Minn.1991) (concluding that a *Miranda* warning should have been given looking at the record as a whole, including the presence of seven police officers). But we have previously concluded that the involvement of two officers does not weigh in favor of custody. *See Wiernasz,* 584 N.W.2d at 2 (concluding that an interrogation conducted by two officers was noncustodial and did not weigh in favor of custody). Here, four officers were present when police first encountered Scruggs at Fonta's apartment and requested that he go to the police station for an interview. Scruggs was not questioned at Fonta's apartment in the presence of four officers; instead, he accompanied a single officer to the police station, where he was interviewed by two officers. On this record, the involvement of two officers in

Scruggs's interview does not weigh in favor of a finding of custody.

Second, Scruggs argues that the interviewing officer's implicit accusation that Scruggs was lying and his lecture on aiding-and-abetting liability would lead a reasonable person to believe he was in custody to the degree associated with formal arrest. This argument lacks merit. The manner in which the police questioned Scruggs did not convert a noncustodial interrogation into a custodial interrogation. *See Wiernasz,* 584 N.W.2d at 2 (holding that "police did not change any of the circumstances" of a noncustodial stationhouse interrogation by informing the defendant that a polygraph had indicated she was 100% deceptive in denying that she did anything to cause her baby to stop breathing and telling her that "they understood there were reasons and they wanted to get to them and get matters resolved"). Additionally, we question whether the record supports the conclusion that Scruggs was implicitly called a liar, and even if it did, such an implicit threat would not lead a reasonable person to believe that he is under arrest when the person has already been informed that the police consider him only a witness and that he will be able to leave after the interview. *See Vue,* 797 N.W.2d at 11, 13 (concluding that an interview was not custodial although defendant had already been told he was a suspect in a homicide investigation and that "[t]his is not going away" (internal quotation marks omitted)).

■ Finally, Scruggs argues his admission during the interview that he was present at Fonta's apartment on the night in question was "highly incriminating" and converted the interview into a custodial interrogation. But Scruggs's statement is only "highly incriminating" in hindsight. At the time of the interview, the police did not know that the apartment was the scene

of Fonta's murder, and therefore the statement is not a "significantly incriminating statement" of the type that would weigh in favor of a finding of custody for the purposes of *Miranda. See Vue,* 797 N.W.2d at 11 (listing factors weighing in favor of a finding of custody). That a person's statement in an initial interview is eventually shown to conflict with another statement that the person makes in a subsequent interview or at trial has no bearing on whether a reasonable person would, at the time of the initial statement, believe he was in custody to the degree associated with formal arrest. *See Thompson,* 788 N.W.2d at 491 (articulating the test for determining whether a person is in custody for the purposes of *Miranda* ).

We hold that under all the surrounding circumstances, a reasonable person would not have believed he was in custody to the degree associated with formal arrest, and therefore Scruggs was not entitled to a *Miranda* warning. As a result, the district court properly admitted Scruggs's statement into evidence.

## II.

Scruggs next argues that the accomplice testimony jury instruction given by the district court was erroneous in two ways. Specifically, Scruggs argues that the court failed to instruct the jury that H.J. was an accomplice as a matter of law. Also, Scruggs argues that the instruction informing the jury that accomplice testimony needed to be corroborated failed to specifically instruct the jury on the aiding-and-advising theory of accomplice liability.

## A.

■ First, Scruggs argues the district court erred in failing to instruct the jury that H.J. was an accomplice as a matter of law because she aided-and-advised him in his commission of the crime. The district

court instructed the jury that a conviction could not be based on the uncorroborated testimony of an accomplice and that the jury was to determine if any witness was an accomplice. Scruggs objected to the district court's refusal to instruct the jury that H.J. was an accomplice. We review a district court's refusal to give a requested jury instruction for abuse of discretion. *State v. Palubicki,* 700 N.W.2d 476, 487 (Minn.2005).

Minnesota Statutes § 634.04 (2010) provides that "[a] conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense." Generally, the test for whether a particular witness is an accomplice is "whether the witness could have been 'indicted and convicted for the crime with which the defendant is charged.'" *State v. Barrientos–Quintana,* 787 N.W.2d 603, 610 (Minn. 2010) (citation omitted). Under Minnesota law, a person is liable for a crime committed by another person as an aider and advisor if the person "intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the [defendant] to commit the crime." Minn.Stat. § 609.05, subd. 1 (2010). Moreover, a witness can be liable for a crime committed by another as an aider and advisor if the witness intentionally aids or advises the defendant to commit a crime other than the one committed and charged if the charged offense was reasonably foreseeable to the witness "as a probable consequence of committing or attempting to commit" the intended crime. *Id.,* subd. 2 (2010).

When imposing liability for aiding and advising, we distinguish between playing "a knowing role in the crime" and "mere presence at the scene, inaction, knowledge and passive acquiescence." *Palubicki,* 700 N.W.2d at 487 (ci-

tation omitted) (internal quotation marks omitted). *Compare State v. Parker,* 282 Minn. 343, 355, 164 N.W.2d 633, 640–41 (1969) (finding accomplice liability where the defendant intended his presence to aid and it did aid the perpetrators of a crime), *with State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981) (finding no accomplice liability where defendant told her son that it would be best if he killed his wife, but did not offer advice or assistance, or tell him how to avoid being caught). If the facts are "undisputed or compel but a single inference" that a witness was an accomplice, the accomplice must be identified in the instructions to the jury. *State v. Pendleton,* 759 N.W.2d 900, 907 (Minn.2009) (citation omitted) (internal quotation marks omitted). But if the question is disputed or subject to differing interpretations, the issue of whether a particular person is an accomplice is a fact question for the jury to resolve. *Id.*

Thus, we must determine whether the facts are undisputed and compel the single inference that H.J. played a knowing role in the crime. Scruggs argues that H.J.'s testimony established that she "was present during the crime, knew about it, and did nothing to prevent it," and was therefore an accomplice as a matter of law. The State concedes that the evidence permits an inference that H.J. was an accomplice but contends that it also permits an inference that she was not an accomplice, and therefore her status as an accomplice was a question of fact properly left to the jury.

We conclude that H.J.'s presence during the entire incident is subject to differing interpretations, and therefore whether she is an accomplice is a fact question for the jury. For example, H.J.'s decision to draw Scruggs's attention to Fonta's insults by nudging him does not, as a matter of law, constitute aiding, advis-

ing, or procuring Scruggs to commit murder or any crime for which murder is a foreseeable outcome. Moreover, H.J.'s statement that Scruggs could not keep the seriously injured victim confined in the apartment may be interpreted as expressing concern that confining Fonta would be dangerous to Fonta's well-being, not that she wanted Scruggs to kill Fonta. Further, the meaning of H.J.'s verbal observation that Fonta moved after Scruggs strangled him is unclear and equivocal. Because both H.J. and Scruggs saw Fonta move, H.J.'s comment may have been merely an observation that did not encourage Scruggs to kill Fonta. Similarly, H.J.'s actions in opening a door for Scruggs and lying to the police are as consistent with her acting out of fear of Scruggs as intentionally aiding the crime. *See id.* at 908 (finding an alleged accomplice's act of opening a door was "as consistent with her acting out of fear as her acting to intentionally aid the crime"). Moreover, lying to the police "is after-the-fact assistance, which is not relevant to an accomplice determination." *Id.*

■ Scruggs relies on *State v. Barrientos-Quintana,* 787 N.W.2d 603 (Minn. 2010) and *State v. Parker,* 282 Minn. 343, 164 N.W.2d 633 (1969) to support his argument that H.J. was an accomplice as a matter of law. But we did not hold in either case that a person's presence during the commission of criminal activity, failure to take steps to prevent the crime, and close association with those who committed the crime *compels* a conclusion that the person is an accomplice as a matter of law for purposes of giving an accomplice corroboration instruction. Rather, we explained that these factors would support a jury's conclusion that the person was an accomplice.[1] *Parker,* 282 Minn. at 355–57, 164 N.W.2d at 641–42. Additionally, we have observed that "to the extent that the question of [the witness]'s accomplice status is close, the district court should have instructed the jury on the accomplice rule and left that question of fact for the jury's determination." *Barrientos-Quintana,* 787 N.W.2d at 612. Based on our analysis, we hold that H.J. was not an accomplice as a matter of law and the district court's refusal to instruct the jury that H.J. was an accomplice was not error.

B.

■ Second, Scruggs argues that the district court erred by failing to instruct the jury that a witness could have been charged with the same crime as Scruggs if the witness aided or advised Scruggs's commission of the offense. Thus, Scruggs argues that the instruction given on the need to corroborate the testimony of an accomplice only did "half the job" because the jury was not told how to determine if a witness could have been charged with Fonta's murder. Scruggs did not object to the instruction on these grounds at trial and raises this issue for the first time on appeal.

---

1. *Parker* did not involve the issue of whether an accomplice corroboration instruction should have been given and instead involved a sufficiency-of-the-evidence challenge to a jury's determination that the defendant aided and advised another in a robbery. 282 Minn. at 355–56, 164 N.W.2d at 641–42. This distinction is important. When a sufficiency-of-the-evidence challenge has been made, an appellate court views the evidence in the light most favorable to the verdict and assumes the jury resolved all factual disputes in the State's favor. *State v. Hawes,* 801 N.W.2d 659, 670 (Minn.2011) (citing *State v. Andersen,* 784 N.W.2d 320, 330 (Minn.2010)). A court does not view the evidence in a similar manner when deciding whether a person should be identified as an accomplice as a matter of law in jury instructions.

Failure to object to jury instructions may result in waiver of the issue on appeal. *State v. Vang*, 774 N.W.2d 566, 581 (Minn.2009). But we have discretion to review instructions not objected to at trial "if the instructions contain plain error affecting substantial rights or an error of fundamental law." *Id.* (citation omitted) (internal quotation marks omitted). To establish plain error, a defendant must show: "(1) an error; (2) that is plain; and (3) the error must affect the defendant's substantial rights." *State v. Larson*, 787 N.W.2d 592, 600 (Minn.2010). This court will order a new trial only if all three prongs of the plain error standard are satisfied and the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Montanaro v. State*, 802 N.W.2d 726, 732 (Minn.2011) (citation omitted) (internal quotation marks omitted).

"A district court errs when its instructions confuse, mislead, or materially misstate the law," but if the instructions read as a whole "correctly state[ ] the law in language that can be understood by the jury, there is no reversible error." *State v. Anderson*, 789 N.W.2d 227, 239 (Minn. 2010); *Vang*, 774 N.W.2d at 581. "An error is 'plain' if it is clear or obvious." *State v. Kuhlmann*, 806 N.W.2d 844, 853 (Minn.2011). "A district court error is 'clear' or 'obvious' when it contravenes a rule, case law, or a standard of conduct, or when it disregards well-established and longstanding legal principles." *State v. Brown*, 792 N.W.2d 815, 823 (Minn.2011). An error affects a defendant's substantial rights if the error was prejudicial. *Kuhlmann*, 806 N.W.2d at 853. In other words, the error is prejudicial "if the defendant proves that there is a reasonable likelihood that the error had a significant effect on the jury's verdict." *Montanaro*, 802 N.W.2d at 732 (citation omitted) (internal quotation marks omitted).

Here, the district court gave the jury an instruction on the need to corroborate an accomplice's testimony consistent with CRIMJIG 3.18. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.18 (5th ed. 2006). Scruggs contends that not only should the jury have been read CRIMJIG 3.18, but that the district court should also have given an instruction on aiding-and-advising liability, and liability for other crimes committed in pursuance of the intended crime that are reasonably foreseeable, as set forth in Minn.Stat. § 609.05, subds. 1–2.[2]

We recognize that in instructing the jury on the need to corroborate the testimony of an accomplice, it may be helpful to give the jury an instruction explaining aiding-and-advising liability, and liability for other crimes under the statute. But we have never held that it is error not to do so. *See, e.g., State v. Caldwell*, 803 N.W.2d 373, 391 (Minn.2011) (concluding that the language of CRIMJIG 3.18 is sufficient to instruct the jury on the requirements of Minn.Stat. § 634.04 and related case law); *Barrientos–Quintana*, 787 N.W.2d at 610 (stating that CRIMJIG 3.18 is "[t]he relevant instruction" to consider whether a witness against the defendant is an accomplice); *State v. Shoop*, 441 N.W.2d 475, 479 (Minn.1989) (stating that an instruction similar to CRIMJIG 3.18 must be given when a witness might be considered an accomplice); *State v. Williams*, 418 N.W.2d 163, 169 (Minn. 1988) (concluding that the court correctly

**2.** Scruggs suggests a jury instruction that adds to the existing CRIMJIG 3.18 language from CRIMJIG 4.01, "Liability for Crimes of Another." *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 4.01 (5th ed. 2006).

instructed the jury regarding accomplice testimony by using CRIMJIG 3.18).

We conclude that it is not necessary to resolve whether it was error not to instruct the jury on aiding-and-advising liability and liability for other crimes, as defined in Minn.Stat. § 609.05, and we decline to do so. Instead, assuming without deciding that the district court erred by failing to so instruct the jury, we conclude that such error was not plain. The court's decision to give only the CRIM-JIG 3.18 instruction does not contravene "a rule, case law, or a standard of conduct," and does not disregard "well-established" or "longstanding legal principles." *See Brown,* 792 N.W.2d at 823. Consequently, the jury instruction given did not constitute plain error.

### III.

Scruggs also argues that his conviction must be reversed because the district court erred by admitting evidence of his prior convictions for assaulting H.J. A district court has broad discretion in evidentiary matters. *See State v. Bolstad,* 686 N.W.2d 531, 541 (Minn.2004). We review a court's decision to admit "[e]vidence of another crime, wrong, or act" (*Spreigl* evidence) for an abuse of discretion. Minn. R. Evid. 404(b); *State v. Fardan,* 773 N.W.2d 303, 315 (Minn.2009).

*Spreigl* evidence "is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). *Spreigl* evidence, however, may be admitted to explain a witness's prior inconsistent statements. *See State v. Harris,* 560 N.W.2d 672, 675–77 (Minn.1997) (permitting the State to introduce evidence of a defendant's prior assaults of his girlfriend when the girlfriend testified that she had previously lied because of the abuse). The use of *Spreigl* evidence in this context is reha-bilitative—that is, it responds to attacks on the witness's credibility based on the prior inconsistent statements. *See id.* at 677 n. 2. Generally, such evidence is admissible only after the character of the witness has been attacked. Minn. R. Evid. 608(a). We have allowed the State to introduce such evidence during its case-in-chief where "there was no question [that] the defense would use [the] prior inconsistent statements to impeach" the witness. *Harris,* 560 N.W.2d at 677 n. 2; *see also State v. McArthur,* 730 N.W.2d 44, 52 (Minn. 2007).

Moreover, Rule 404(b) sets forth the requirements for admissibility of *Spreigl* evidence. It provides that such evidence shall not be admitted unless:

> 1) the prosecutor gives notice of its intent to admit the evidence . . .; 2) the prosecutor clearly indicates what the evidence will be offered to prove; 3) the other crime, wrong, or act and the participation in it by a relevant person are proven by clear and convincing evidence; 4) the evidence is relevant to the prosecutor's case; and 5) the probative value of the evidence is not outweighed by its potential for unfair prejudice to the defendant.

Minn. R. Evid. 404(b); *State v. Loving,* 775 N.W.2d 872, 880 (Minn.2009).

It is undisputed that the State satisfied the first three factors—notice of its intent to use the evidence was given before trial; the prosecutor stated the evidence was offered to show H.J.'s fear of Scruggs and to explain why she made inconsistent statements to police; and the six prior convictions of assault were proven by clear and convincing evidence. Thus, we examine the fourth and fifth factors.

The district court concluded that evidence of Scruggs's prior assaults was admissible to explain why H.J. feared

Scruggs, that her fear explained the discrepancies in her statements, and that the probative value outweighed the potential for unfair prejudice. The court permitted the State to ask H.J. the following two leading questions:

Q Has the defendant assaulted and hurt you in the past?

A Yes.

. . . .

Q For some of that conduct has he been convicted?

A Yes.

The court then gave a limiting instruction to the jury regarding the use of H.J.'s testimony about Scruggs's prior assault convictions.

Scruggs argues that the evidence is not relevant to explain H.J.'s inconsistent statements and therefore the fourth prong is not satisfied. This argument lacks merit. At trial, the State argued that H.J.'s initial false statements to the police were motivated by her fear of Scruggs. Conversely, defense counsel challenged the legitimacy of that fear through cross-examination of H.J. Scruggs's prior assaults of H.J. unquestionably make the existence of H.J.'s fear—a fact that is of consequence to the determination of the case—more probable than it would be without the evidence. *See* Minn. R. Evid. 401. Thus, her testimony regarding Scruggs's prior assaults is clearly relevant.

The fifth factor examines whether "the probative value of the evidence is . . . outweighed by its potential for unfair prejudice to the defendant." Minn. R. Evid. 404(b). Prior bad act evidence can be unfairly prejudicial if it is used by the jury for an improper purpose, such as proof of a defendant's propensity to commit the charged offense or general propensity for violence. *State v. Ness*, 707 N.W.2d 676, 685 (Minn.2006). When ex-

amining whether the probative value of *Spreigl* evidence outweighs its potential for unfair prejudice to a defendant, "we balance the relevance of the [bad acts], the risk of the evidence being used as propensity evidence, and the State's need to strengthen weak or inadequate proof in the case." *Fardan*, 773 N.W.2d at 319.

Scruggs argues that the evidence has little probative value because the legitimacy and existence of H.J.'s fear of him needed no confirmation. Specifically, Scruggs argues that because H.J. watched him brutally murder Fonta and Scruggs subsequently threatened H.J. after he bailed her out of jail, her fear of him "is utterly noncontroversial." This argument is undercut by defense counsel's attempt, on cross-examination, to attack the reasonableness of H.J.'s explanation that she told lies to the police because she was afraid of Scruggs. Although the violent nature of Fonta's murder and Scruggs's explicit threats may have diminished the probative value of H.J.'s testimony regarding his prior assaults, the testimony was relevant to establish that she had reason to fear that he would carry out those threats. Additionally, because Scruggs vigorously attacked H.J.'s account of the murder and his subsequent threats against her, the State had a clear need for objective evidence of Scruggs's prior assaults of H.J. to strengthen H.J.'s credibility in light of her inconsistent statements to police.

Next, Scruggs argues that the probative value of H.J.'s testimony about the assaults was diminished because it was given on direct examination and, at that point, did not respond to any attacks by the defense on H.J.'s credibility. The crux of Scruggs's argument is that the evidence offered is rehabilitative evidence that should only be introduced on re-direct examination, after the witness's credibility has been attacked by the defense. We

have previously observed that the probative value of evidence of a witness's fears is greatest when offered on redirect examination, in response to attacks on the witness's credibility. *McArthur*, 730 N.W.2d at 52. But it is appropriate in some instances for a party to anticipate challenges to witness credibility and to explain the anticipated issues on direct examination. *Id.; Harris*, 560 N.W.2d at 677 n. 2. On this record, we see no abuse of discretion.

Finally, Scruggs argues that the risk of prejudice was heightened in this case because the district court's limiting instruction did not cure the potential that the jury would misuse the evidence. Following H.J.'s testimony, the court instructed the jury:

> Members of the jury, so you're clear, Mr. Scruggs is not charged with any offense against [H.J.]. He can't be convicted of that, nor is he charged with any offense involving crack cocaine. There was evidence of that a little while ago here. This evidence is received not to convict him of any offense against [H.J.], or of any drug offense. It's just received for whatever use it might be to you in evaluating the other evidence.

During final instructions, the court gave a slightly different instruction, which tracked CRIMJIG 3.16, a general cautionary instruction on other-crimes evidence. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—jury Instruction Guides, Criminal*, CRIMJIG 3.16 (5th ed. 2006). Previously, we have explained that *Spreigl* evidence does not always fit neatly into categories, and we have not mandated a specific limited purpose instruction for *Spreigl* evidence. *See Ture v. State*, 681 N.W.2d 9, 18 (Minn.2004).

The cautionary instructions viewed as a whole reduced the risk of unfair prejudice. We do not believe there was any heightened risk of prejudice from the *Spreigl*

evidence admitted in this case. Therefore, we hold that the district court did not abuse its discretion by permitting H.J. to testify on direct examination that Scruggs had previously assaulted her and had been convicted for at least one such assault. The evidence was relevant to explain why she feared Scruggs, and to explain the discrepancies between her statements.

## IV.

■ Scruggs also raises a number of arguments in his pro se brief. Scruggs alleges that H.J.'s testimony was false, and that the State knowingly offered this testimony in violation of his Fourteenth Amendment right to due process. Although Scruggs asserts that the State knowingly presented perjured testimony, he does not identify any evidence—either in the record or outside of it—to support this allegation. Instead, he argues that H.J. is not a credible witness and that her testimony was false and "full of improbabilities and inconsistencies." H.J. testified and was vigorously cross-examined at trial. It was properly left to the jury to assess her credibility and determine the weight it believed her testimony deserved. *See State v. Mems*, 708 N.W.2d 526, 531 (Minn. 2006) (stating it is the exclusive province of the jury to assess the credibility of a witness and the weight to be given to a witness's testimony, and "[t]he jury is free to accept part and reject part of a witness's testimony").

Additionally, Scruggs argues that "counsel did not provide [him] with reasonably competent advice"; that the district court erred by admitting "confessions" into evidence, improperly limiting access to H.J.'s medical records, improperly allowing the State to make "additional closing arguments," and making several errors in the sentencing; and that the State committed prejudicial misconduct by telling the jury

that Scruggs thought "they were gullible." We have carefully reviewed the pro se arguments and conclude that they are without merit.

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.