STATE OF MINNESOTA

IN SUPREME COURT

A15-1294

Pennington County                                                          Wright, J.
                                    Dissenting, Lillehaug, J., Gildea, C.J., Anderson, J.

Jedidiah Dean Troxel,

                Appellant,

vs.                                                          Filed:  February 17, 2016
                                                            Office of Appellate Courts
State of Minnesota,

                Respondent.

_____

Benjamin J. Butler, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, Saint Paul, Minnesota; and

Alan G. Rogalla, Pennington County Attorney, Thief River Falls, Minnesota, for respondent.
_____

S Y L L A B U S

1.      The district court did not abuse its discretion by denying appellant's motion to introduce alternative-perpetrator evidence.

2.      The district court did not abuse its discretion by denying appellant's request for a jury instruction on the lesser-included offense of second-degree intentional murder.

3.      The presiding judge at appellant's trial was not disqualified for an appearance of partiality.

1

Affirmed.

WRIGHT, Justice.

On November 5, 2013, a Pennington County jury found appellant Jedidiah Dean Troxel guilty of three counts of first-degree murder while committing first-degree criminal sexual conduct, Minn. Stat. §§ 609.185(a)(2), 609.342, subd. 1(c), 1(d), 1(e)(i) (2014). Following his conviction, the district court sentenced Troxel to life in prison without the possibility of release. Minn. Stat. § 609.185(a). Troxel did not pursue a direct appeal. Instead, he filed a timely petition for postconviction relief, alleging that he is entitled to relief based on three alleged errors committed by the district court: the exclusion of alternative-perpetrator evidence; the denial of a lesser-included-offense instruction on second-degree intentional murder; and the denial of Troxel's motion to remove the trial judge for an appearance of partiality. The postconviction court denied relief on all grounds,[1] and Troxel appealed. For the reasons addressed below, we affirm.

I.

Shortly before noon, on Sunday, August 26, 2012, a fisherman found the body of T.K. near Smiley Bridge, about six miles from Thief River Falls. The victim had 37 stab wounds, primarily to her chest and neck, and one incision wound across her neck. The victim also had sustained blunt-force trauma to her head and face, abrasions to her neck

---

[1]    The postconviction court denied the petition without holding an evidentiary hearing because Troxel's petition explicitly stated that no evidentiary hearing was requested.

2

and shoulders, bruises on her left hand and right arm, bruises on her inner thighs, and an abrasion on her upper-inner right thigh next to her external genitalia. The victim bled to death from her injuries.

The victim attended a party at the home of a friend, B.M., on the night before and the morning of the murder. Troxel was present at this party. Some attendees of the party, including the victim, played a game that involved removing clothing. During the game, the victim removed her shirt and bra. The victim also grabbed and rubbed Troxel's leg and B.M.'s leg. Troxel told police that the victim rubbed his butt, tried to rub or grab his crotch, and expressed her desire to perform oral sex on him.

The party began to break up around 6:00 a.m. on August 25, 2012. As the party was ending, one witness saw Troxel putting on and lacing black boots. When another witness left the party around 6:00 a.m., she saw the victim outside talking with Troxel, while the victim was standing next to the driver's side of Troxel's car. Troxel told police that he left the party around 6:00 a.m. and drove home alone. He also said that the victim left about five minutes before he left. Troxel denied that the victim ever entered his car, denied that the victim spoke to him outside his car after the party ended, and denied having sex with the victim. Troxel also denied wearing his black boots on both the night before and the morning of the murder. Instead, according to Troxel, he wore red tennis shoes and left his black boots at home.

On August 25, 2012, at about 7:10 a.m., a local resident saw a car parked on a gravel road near Smiley Bridge. The resident, who had 15 years of experience doing body work on cars, thought the vehicle was a Mitsubishi Eclipse. Troxel's car was a

3

1997 Mitsubishi Eclipse. The victim's body was found near Smiley Bridge shortly before noon on August 26, 2012.

Police investigators recovered semen from vaginal and cervical swabs taken from the victim's body. The semen from the vaginal swab contained a single-source DNA profile that matched Troxel. The semen from the cervical swab contained a mixture of DNA. The predominant DNA profile matched Troxel, although the victim's husband could not be excluded as a contributor to a minor DNA profile.

Police also recovered blood on Troxel's shirt and in Troxel's car on the driver-side door handle and on the gear shift. The blood on Troxel's shirt and on the gear shift contained a single-source DNA profile that matched the victim's DNA. The blood on the door handle contained a mixture of DNA from which 99.7% of the world's population could be excluded, but the victim's DNA could not be excluded. Police also found the victim's fingerprint on the exterior passenger window of Troxel's car.

In addition, police found footwear impressions in the mud next to the victim's body. The brand logo in one impression was similar to that on a pair of black boots, with damp mud on them, that investigators found in Troxel's bedroom. A surveillance camera at a liquor store recorded Troxel wearing black boots on the night before the murder. And a witness saw Troxel wearing black boots on the morning of the murder.

A Pennington County grand jury indicted Troxel on three counts of first-degree murder while committing a first-degree criminal sexual assault. Troxel sought a for-cause removal of the judge presiding over his trial because the judge was negotiating to become a prosecutor in a neighboring county. The Chief Judge of the Ninth Judicial

District denied this motion. Troxel then petitioned the court of appeals for a writ of prohibition, seeking removal of the trial judge. The petition was denied. *In re Troxel*, No. A13-1965, Order (Minn. App. filed Oct. 25, 2013). Troxel did not file a petition for review with this court.

Before trial, Troxel also moved to introduce alternative-perpetrator evidence pertaining to M.W., who sent the victim sexually explicit text messages on the morning of the murder. The district court denied this motion. Before closing arguments, Troxel sought a jury instruction on the lesser-included offense of second-degree intentional murder, arguing that a rational basis existed to acquit Troxel of the first-degree murder charge because the sexual activity between Troxel and the victim was consensual. The district court declined to give this instruction.

The jury found Troxel guilty of the three counts of first-degree murder, and the district court sentenced Troxel to life in prison without the possibility of release. Troxel did not file a direct appeal. Rather, Troxel filed a timely petition for postconviction relief, alleging that (1) the district court erroneously denied his request to introduce alternative-perpetrator evidence; (2) the district court erroneously denied his request for a lesser-included-offense instruction on second-degree intentional murder; and (3) the trial judge was disqualified for an appearance of partiality under Minnesota Code of Judicial Conduct, Rule 2.11(A). The postconviction court denied relief on each ground. This appeal followed.

II.

We first address whether the district court abused its discretion by denying Troxel's motion to introduce alternative-perpetrator evidence. A district court's denial of a motion to introduce alternative-perpetrator evidence is reviewed for an abuse of discretion. *State v. Jenkins*, 782 N.W.2d 211, 224 (Minn. 2010).

The due process clauses of both the Minnesota Constitution and the United States Constitution guarantee a defendant's right to a fair opportunity to defend against criminal charges. U.S. Const. amend. XIV; Minn. Const. art. 1 § 6; *Jenkins*, 782 N.W.2d at 226; *State v. Jones*, 678 N.W.2d 1, 15-16 (Minn. 2004). This constitutional guarantee includes the right to present evidence that a third party (an "alternative perpetrator") committed the crime for which the defendant was charged. *Jenkins*, 782 N.W.2d at 226; *Jones*, 678 N.W.2d at 15-16. A foundational requirement for the admission of alternative-perpetrator evidence is that such evidence must "inherently connect[] an alternative perpetrator to the commission of the charged crime regardless of the strength of the State's case." *Jenkins*, 782 N.W.2d at 226; *see Huff v. State*, 698 N.W.2d 430, 436 (Minn. 2005). This requirement "avoids the use of bare suspicion and safeguards the [alleged alternative perpetrator] from indiscriminate use of past differences with the deceased." *Jones*, 678 N.W.2d at 16 (quoting *State v. Richardson*, 670 N.W.2d 267, 280 (Minn. 2003)). If the defendant satisfies this foundational requirement, the district court may, consistent with evidentiary rules, "admit 'evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts' tending to

6

prove the third party committed the crime." *Huff*, 698 N.W.2d at 436 (quoting *State v. Hawkins*, 260 N.W.2d 150, 159 (Minn. 1977)).

We apply the harmless-error test to the erroneous exclusion of alternative-perpetrator evidence. *State v. Vance*, 714 N.W.2d 428, 437 (Minn. 2006). A conviction will stand despite erroneously excluded evidence when the error was harmless beyond a reasonable doubt. *State v. Hokanson*, 821 N.W.2d 340, 353 (Minn. 2012); *State v. Post*, 512 N.W.2d 99, 102 (Minn. 1994). An error is "harmless beyond a reasonable doubt" when, assuming the potential damage of the excluded evidence were fully realized, a reasonable jury "would have reached the same verdict." *Post*, 512 N.W.2d at 102. Conversely, if "there is a reasonable possibility that the verdict might have been different if the evidence had been admitted, then the erroneous exclusion of the evidence is prejudicial." *Id.*

Troxel filed an offer of proof regarding an alleged alternative perpetrator, M.W. This proffer consisted of two types of evidence: sexually explicit text messages[2] between M.W. and the victim sent early on the morning of the murder and M.W.'s statements to police on the day after the murder. In a police interview, M.W. admitted that he had been texting with the victim during the morning of August 25, 2012. The victim had asked M.W. to pick her up at a friend's home, where she had been attending a party. M.W. arrived at the home around 3:45 a.m. After M.W. arrived, the victim texted M.W., asking

---

[2]     The text messages included, "Y u want me"; "U got me awake and hard"; "Want me 2 come 2 town then"; "We could go 4 a drive lol"; "How wet r u"; "Hope soon u got me hard as hell"; "Lol whos gona cum 1st"; "Ready 4 that drive"; and "I would have made u lose ur pantys."

7

him to come inside to have a drink. M.W. declined and instead waited outside in his car. After waiting outside for about an hour, M.W. got tired, drove back home, and went to bed with his wife. M.W. never saw the victim come outside.

The district court excluded the alternative-perpetrator evidence, concluding that Troxel had failed to establish the foundational requirement that the evidence demonstrate "an inherent tendency to connect M.W. with the commission of the crime." The district court explained that the offer of proof was "perhaps even less compelling than what was presented in the *Jenkins* case [782 N.W.2d 211, 228 (Minn. 2010)] as [Troxel] has not established M.W.'s presence at the scene of the crime, let alone a connection to his actual commission of the charged offense[s]."

We have consistently held that "mere presence" at a crime scene, without more, is insufficient to establish an "inherent connection" to the commission of a crime. *Jenkins*, 782 N.W.2d at 226; *see, e.g.*, *id.* at 226-27 (stating that "the [offer of proof] at most established that [the alleged alternative perpetrator] was present [at the crime scene] at some point on the night of the charged crime" but not that he "was present at the . . . time of the crime"). Similarly, an alternative perpetrator's mere communication with the victim near the time of the crime, without more, lacks sufficient evidentiary foundation. *See State v. Williams*, 593 N.W.2d 227, 234 (Minn. 1999); *State v. Harris*, 560 N.W.2d 672, 680 (Minn. 1997).

Here, the evidence proffered by Troxel does not even establish "mere presence." There is no evidence that M.W. was at or near the crime scene—Smiley Bridge—when the murder occurred. Rather, the proffered evidence merely shows that, earlier that

8

morning, M.W. and the victim communicated by text message at a *different* location, the party at B.M.'s home. M.W.'s mere communication with the victim on the same day of the murder is insufficient to satisfy our foundational requirement. *See, e.g.*, *Williams*, 593 N.W.2d at 234 ("While there was some evidence that [the alleged alternative perpetrator] may have placed telephone calls to [the victim's] house on the day of the murder, Williams offered no evidence placing [the alleged alternative perpetrator] at or near [the victim's] house on the night of the murder."); *Harris*, 560 N.W.2d at 680 ("The only direct connection between [the alleged alternative perpetrator] and [the victim] on the night of her murder was that witnesses saw them talking outside of a bar after closing").

Although the text messages between M.W. and the victim were sexually explicit, and suggest a desire to have sex and to "go 4 a drive" on the morning of the murder, this evidence does not inherently connect M.W. to the victim's murder. Troxel argues that M.W.'s sexually explicit messages, and his unfulfilled quest to have a sexual rendezvous with the victim, established a motive for M.W., as a "spurned potential lover," to rape and kill the victim. There is limited, if any, probative value in the argument that M.W.'s sexual desire created a motive to rape and kill, absent any overt indication of violence, threats, anger, jealousy, or frustration (beyond the fact that a proposed rendezvous did not occur). Even if we assume that M.W. had a potential motive to rape and kill, any such purported motive fails to inherently connect M.W. to the commission of the victim's murder at the time and place that it occurred. "Evidence of motive alone does not have

9

the inherent tendency to connect a third party to the commission of the crime." *State v. Larson*, 787 N.W.2d 592, 598 (Minn. 2010).

In addition to this purported motive, Troxel argues that M.W. had an "opportunity" to kill the victim because "no one can attest to [M.W.'s] whereabouts after he sat outside [B.M.'s home]" waiting for the victim. M.W. told police that he drove back home and went to bed with his wife. Troxel dismisses this alibi because the source of this evidence was M.W.'s "self-serving statements" to police. But even if M.W. had not made a statement and his whereabouts were completely unknown, the lack of an alibi does not establish sufficient foundation to present alternative-perpetrator evidence. The defendant must proffer foundational evidence that inherently *connects* the alleged alternative perpetrator to the commission of the crime. Mere speculation is insufficient. *See State v. Nissalke*, 801 N.W.2d 82, 102 (Minn. 2011) ("[B]are assertions as to what could have happened are not evidence and do not have an 'inherent tendency' to connect [the alleged alternative perpetrators] to the crime.").

The totality of Troxel's proffered evidence, including M.W.'s presence near the party, the communication with the victim by text message, the purported motive as a "spurned potential lover," and the purported "opportunity" to commit the crime based on the absence of a confirmed alibi, is insufficient to satisfy the foundational requirement establishing M.W.'s inherent connection to the victim's murder. Because Troxel failed to present foundational evidence that inherently connected M.W. to the commission of the murder, the district court did not abuse its discretion by denying Troxel's motion to introduce alternative-perpetrator evidence.

10

III.

We next consider whether the district court abused its discretion by denying a jury instruction on the lesser-included offense of second-degree intentional murder. "We review a district court's denial of a lesser-included offense instruction for abuse of discretion." *State v. Van Keuren*, 759 N.W.2d 36, 39 (Minn. 2008).

It is well-established that, when "the evidence warrants a lesser-included offense instruction, the trial court must give it." *State v. Dahlin*, 695 N.W.2d 588, 597 (Minn. 2005) (*Dahlin I*). A lesser-included offense instruction is warranted when (1) the lesser offense is included in the charged offense; (2) the evidence provides a rational basis for acquitting the defendant of the charged offense; and (3) the evidence provides a rational basis for convicting the defendant of the lesser-included offense. *Id.* at 595 (citing *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125-26 (1975)). When determining whether to provide a lesser-included-offense instruction, a district court views the evidence in the light most favorable to the party requesting the instruction. *Id.* at 596. The district court "may not weigh the evidence or make credibility determinations" because those tasks are reserved for the jury. *Id.* at 596-98.

Unless the defendant was prejudiced by the district court's erroneous denial of a lesser-included-offense instruction, we will not reverse. *Id.* at 598-99. To determine whether the defendant was prejudiced, an appellate court "should consider the instructions actually given and the verdict rendered by the jury." *Id.* A defendant is prejudiced when the jury may have convicted the defendant of only the lesser offense had the lesser-included-offense instruction been given. *Id.* at 599 & n.2.

11

In *Dahlin I*, we reviewed the denial of lesser-included-offense instructions on second-degree intentional murder and second-degree unintentional felony murder. 695 N.W.2d at 599. We began our analysis by determining the elements that distinguished the charged offense (first-degree murder) from the lesser second-degree murder offenses, including the elements of intent and premeditation. *See id.* at 599-601. We held that, when the evidence was viewed in the light most favorable to the defendant, the trial court "abused its discretion in determining that no rational basis existed in the evidence for the jury to find that [the defendant killed the victim] without premeditation." *Id.* at 601.

Here, the element distinguishing the instructions on first-degree premeditated murder and the requested instructions on second-degree intentional murder was forced sexual penetration. *Compare* Minn. Stat. § 609.185(a)(2) (providing that a person is guilty of first-degree murder if that person "causes the death of a human being while committing or attempting to commit criminal sexual conduct in the first or second degree with force or violence"), *and* Minn. Stat. § 609.342, subd. 1(c), 1(d), 1(e)(i) (providing that a person is guilty of criminal sexual conduct in the first degree if that person engages in sexual penetration, by use of force or coercion, by causing reasonable fear of imminent great bodily harm, or by use of a dangerous weapon), *with* Minn. Stat. § 609.19, subd. 1(1) (2014) (providing that a person is guilty of second-degree intentional murder if that person "causes the death of a human being with intent to effect the death of that person").

There was clearly a rational basis to conclude that Troxel committed the second-degree intentional murder. The intent to take the victim's life was established by stabbing her 37 times. Therefore, we focus our analysis on whether, as the parties frame

12

the question, there *also* was a rational basis for the jury to acquit on the first-degree murder charges by finding that the victim "consented" to Troxel's sexual penetration, that is, Troxel sexually penetrated the victim without causing a reasonable fear of imminent great bodily harm, without force or coercion, and without the use of a dangerous weapon. *See* Minn. Stat. §§ 609.185(a)(2), 609.342, subd. 1(c), 1(d), 1(e)(i).

Even when viewing the evidence in the light most favorable to Troxel, the evidence did not present a rational basis to conclude that Troxel's sexual penetration of the victim was consensual. The "light most favorable" standard does not preclude the consideration of undisputed physical evidence when there is no rational basis for the jury to disbelieve such evidence. *See State v. Goodloe*, 718 N.W.2d 413, 423 & n.7 (Minn. 2006) ("While it is theoretically possible that the jury could have believed all of the state's evidence except the evidence relevant to premeditation, we cannot discern any rational basis for the jury to have done so."). The physical evidence indicates that Troxel raped the victim. The victim was found nude from the waist down. Her shirt was pushed up around her breasts. And she was lying in a muddy ditch amid tall grass near Smiley Bridge. Mud covered her legs up to her knees. The forensic examination of the victim's body produced no evidence that semen had leaked from her vagina, which likely would have occurred had the victim stood up or walked around after Troxel deposited his semen. Consequently, the physical evidence demonstrates that the sexual penetration likely occurred in that mud-filled ditch, which is an improbable location for consensual sexual activity. Moreover, the medical examiner observed fresh-appearing bruises on the inner aspects of the victim's right and left thighs, and a fresh-appearing abrasion on the

13

"upper inner aspect" of her right thigh, next to her external genitalia.  *See State v. Murphy*, 380 N.W.2d 766, 771-72 (Minn. 1986) (holding that there was "no proof" that would rationally support a lesser offense of indecent liberties, based on evidence that "clearly support[ed]" rape, including the absence of clothing, defensive wounds on the victim's hands, and other injuries).  Thus, the placement, position, and condition of the victim's body were inconsistent with consensual sexual activity.

This physical evidence regarding the nature of the victim's injuries and the lack of semen leakage was established primarily by testimony and exhibits from the State's medical expert.  Indeed, this evidence was not disputed.  Troxel's counsel did not cross-examine this expert witness, nor did the defense offer any evidence countering this expert testimony.  And Troxel does not now dispute any aspect of the physical evidence regarding the victim's injuries or the absence of semen leakage.  Thus, this undisputed physical evidence may be considered when determining whether a lesser-included-offense instruction was warranted, as there was no rational basis for the jury to have disbelieved it.  *Goodloe*, 718 N.W.2d at 423 & n.7.

Troxel relies on the following facts in support of his argument that a rational basis existed to find consensual penetration: the attendees of the party, including the victim, played a game that involved removing clothing; the victim took off her shirt and bra; a witness saw the victim touch Troxel's leg; Troxel told police that the victim rubbed his butt and tried to rub or grab his crotch; and Troxel told police that the victim said she wanted to perform oral sex on him.  When considered "in the light most favorable" to Troxel, *Dahlin I*, 695 N.W.2d at 594, this evidence merely establishes that, while at the

14

party, the victim was aroused and generally interested in sexual activity. This evidence does not rationally support a finding that, later that morning, the victim consented to Troxel penetrating her vagina with his penis, in a muddy ditch near Smiley Bridge, in a manner that resulted in bruises to her inner thighs and an abrasion next to her genitals. *Cf. In re Interest of M.T.S.*, 609 A.2d 1266, 1278 (N.J. 1992) (interpreting a state statute on rape as requiring the factfinder to decide "whether the defendant's act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the alleged victim had freely given affirmative permission to the specific act of sexual penetration").

Our conclusion is consistent with our decision in *Murphy*, 380 N.W.2d at 772. We held in *Murphy* that there was "no proof" of mere sexual contact that would support a conviction of a lesser offense (indecent liberties), based on uncontroverted physical evidence that "clearly support[ed]" a finding that the defendant raped the victim in an alley. This physical evidence included the absence of clothing, the defensive wounds present on the victim's hands, a fractured jaw, and facial injuries. *Id.* Here, although evidence exists that the victim was sexually interested in Troxel during the party, the record provides no rational basis to conclude that Troxel and the victim engaged in consensual sexual penetration in the muddy ditch near Smiley Bridge. The undisputed physical evidence clearly supports a finding of rape.

A district court may deny the lesser-included-offense instruction when the evidence, viewed in the light most favorable to the defendant, is insufficient to provide a rational basis to acquit on the charged offense and convict on the lesser offense. *Dahlin*

15

*I*, 695 N.W.2d at 595. Applying that rule here, even when the record is viewed in the light most favorable to Troxel, with all doubts resolved in his favor, there is insufficient evidence for a jury to rationally find that the victim consented to the sexual penetration. Therefore, the district court did not abuse its discretion by denying an instruction on the lesser-included offense of second-degree intentional murder.

IV.

We next consider whether the presiding judge at Troxel's jury trial was disqualified based on an appearance of partiality under the Minnesota Code of Judicial Conduct, Rule 2.11(A). Our review of this issue is de novo. *In re Jacobs*, 802 N.W.2d 748, 750 (Minn. 2011); *State v. Dorsey*, 701 N.W.2d 238, 246 (Minn. 2005).

A.

Judge Donald Aandal was assigned on August 28, 2012, to preside over Troxel's trial in Pennington County District Court, which is in the Ninth Judicial District. Approximately five months later, on January 16, 2013, Judge Aandal issued an order for recusal, which stated:

> Whereas this Court has engaged in employment negotiations with the law firms Drenckhahn & Williams, P.A., Galstad, Jensen & McCann, P.A., and the Marshall County Attorney's Office, and whereas this Court is therefore disqualified from hearing cases involving the above-listed entities, it is therefore ordered that this Court shall not hear or be assigned any cases involving those entities.

On September 26, 2013, Troxel filed a motion to remove Judge Aandal for cause based on an appearance of partiality. Minn. R. Crim. P. 26.03, subd. 14(3) (providing that a judge may be removed if "disqualified under the Code of Judicial Conduct");

16

Minn. R. Jud. Conduct 2.11(A) (providing that a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned"). In support of this motion, Troxel filed an affidavit from his attorneys that stated, in relevant part, that Judge Aandal was in the "final stages" of negotiations to purchase a law firm in Marshall County and "to be appointed to the Marshall County Attorney's Office as prosecutor"; Judge Aandal "intended to resign his judgeship" with Pennington County and "take employment with Marshall County on or about January 1, 2014"; "Marshall County and Pennington County are adjacent and . . . 29 miles apart"; "Marshall County and Pennington County law enforcement agencies often share resources and cooperate"; and these agencies, and the county attorney offices, use the services of both the Minnesota Bureau of Criminal Apprehension and the Minnesota Attorney General's Office.

The Chief Judge of the Ninth Judicial District denied Troxel's motion to remove Judge Aandal. *State v. Troxel*, No. 57-CR-12-711 (Minn. Dist. Ct. Oct. 10, 2013). Troxel then filed a petition for a writ of prohibition with the court of appeals. The court of appeals denied the writ of prohibition, concluding that Troxel "has not established that, based on an objective examination of the circumstances, [Judge Aandal's] impartiality might reasonably be questioned." *In re Troxel*, A13-1965, Order at 4 (Minn. App. Oct. 25, 2013). Troxel did not file a petition for review with our court. Troxel's trial proceeded with Judge Aandal presiding.

17

B.

Before addressing the merits of Troxel's judge-removal claim, we first consider whether Troxel forfeited appellate review of this issue when he failed to file a petition for review. In *State v. Dahlin*, 753 N.W.2d 300 (Minn. 2008) (*Dahlin II*), we held that (1) a party must seek a writ of prohibition from the court of appeals to preserve a peremptory removal issue, *id.* at 303; and (2) "a party must timely petition this court for review of the denial of a writ of prohibition when the issue involves the right of peremptory removal," and a party's "failure to do so constitutes waiver of further review," *id.* at 304-05.

After the court of appeals denied Troxel's writ of prohibition, Troxel did not petition for further review by our court. It is unclear whether forfeiture[3] applies here because our decision in *Dahlin II* addressed *peremptory* removals, Minn. R. Crim. P. 26.03, subd. 14(4), but Troxel sought a *for-cause* removal of Judge Aandal, Minn. R. Crim. P. 26.03, subd. 14(3).

In *Hooper v. State*, 838 N.W.2d 775 (Minn. 2013), we declined to resolve whether the *Dahlin II* forfeiture rule extends to for-cause removal requests. We stated that, "a defendant's failure to seek a writ of prohibition constitutes waiver of further appellate review 'when the issue involves the right of *peremptory removal*.' However, we have never decided whether the waiver rule extends to . . . removal of a judge *for cause*." *Id.*

---

[3] *Dahlin II* used the term "waiver," 753 N.W.2d at 305, but this court has recently emphasized the distinction between waiver, which refers to the intentional relinquishment of a known right, and forfeiture, which refers to the failure to make a timely assertion of a right. *State v. Beaulieu*, 859 N.W.2d 275, 278 n.3 (Minn. 2015) ("We . . . use the word 'forfeiture' when describing a failure to make a timely assertion of a right.").

at 789 n.4 (citation omitted). We then declined to resolve this forfeiture question because the removal claim failed on its merits. *Id.*

In *State v. Finch*, 865 N.W.2d 696, 700-01 (Minn. 2015), we held that a defendant is not required to petition for a writ of prohibition to avoid forfeiture of a for-cause judge-removal claim. Thus, *Finch* confirms that the first aspect of *Dahlin II*—that a party is required to petition for a writ of prohibition to avoid forfeiture of a peremptory-removal issue—does not extend to for-cause removal requests. But *Finch* did not resolve the application of the second aspect of *Dahlin II*—that is, if a party chooses to petition for a writ of prohibition, and the court of appeals denies the writ, whether the party must file a petition for review with our court to preserve the claim. Since our decision in *Finch*, we have not squarely addressed whether this second aspect of the *Dahlin II* forfeiture rule extends to for-cause removal requests. We decline to resolve this forfeiture issue here because Troxel's judge-removal claim fails on its merits.

C.

A judge "must not preside at a trial or other proceedings if disqualified under the Code of Judicial Conduct," Minn. R. Crim. P. 26.03, subd. 14(3), and a judge "shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," Minn. R. Jud. Conduct 2.11(A). "Impartiality" means the "absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintenance of an open mind in considering issues." *State v. Pratt*, 813 N.W.2d 868, 876 (Minn. 2012) (quoting Terminology, Minnesota Code of Judicial Conduct). A judge is presumed to be "able to 'approach every aspect of each case with a

19

neutral and objective disposition.' " *Jacobs*, 802 N.W.2d at 754 (quoting *Dorsey*, 701 N.W.2d at 247). A judge is disqualified for a lack of "impartiality" under Rule 2.11(A) if a "reasonable examiner," from the perspective of an objective "layperson with full knowledge of the facts and circumstances," would "question the judge's impartiality." *Pratt*, 813 N.W.2d at 876 & n.8 (quoting *Jacobs*, 802 N.W.2d at 753).

In *Jacobs*, we concluded that a reasonable examiner would not question a judge's impartiality based on his spouse's employment in the Hennepin County Attorney's Office (HCAO), even though that office prosecuted the case, because the HCAO handled a high volume and a wide variety of cases; the spouse had no personal involvement in the case; the spouse had no financial interest in the outcome of the case; and, although the spouse worked for the criminal appellate division of the HCAO at one time, the spouse worked for a different division of the HCAO at the time of trial. 802 N.W.2d at 753.

Conversely, in *Pratt*, we concluded that a reasonable examiner would question a judge's impartiality because the judge was retained to provide expert-witness services in a civil trial for the HCAO, while presiding at a trial prosecuted by the HCAO. 813 N.W.2d at 876-77. *Pratt* is distinguishable from other cases because the judge was "actually retained by the prosecuting authority at the same time the prosecuting authority was appearing before the judge." *Id.* at 878. In addition, "the judge stood to benefit financially from being retained" by the HCAO, and as an expert witness for HCAO, the judge "was to act in a way that was aligned with the HCAO's interests." *Id.* at 877.

Here, unlike in *Pratt*, Judge Aandal was not retained by the Pennington County Attorney's Office (PCAO); he was not expected to act in a way that was aligned with the

20

interests of the PCAO; and he did not stand to benefit financially from the PCAO. Rather, during Troxel's trial, he was in negotiations to purchase a law firm in Marshall County and work for the Marshall County Attorney's Office (MCAO).

Troxel cites dicta from *Pratt* and from several decisions of other jurisdictions to support the general proposition that a judge places impartiality in question by engaging in employment negotiations for a position as a prosecutor at the time of the trial. *See Pratt*, 813 N.W.2d at 877-78 ("Some courts have found that merely negotiating for future employment might cause a reasonable observer to question a judge's impartiality."); *see also Pepsico, Inc. v. McMillen*, 764 F.2d 458, 459-60 (7th Cir. 1985); *Scott v. United States*, 559 A.2d 745, 746-50 (D.C. Cir. 1989); *DeNike v. Cupo*, 958 A.2d 446, 449 (N.J. 2008). These cases are distinguishable. In each of these cases, the judge was employed by, or seeking future employment with, an entity currently appearing before the judge. Here, by contrast, Judge Aandal was not employed by, or seeking employment with, the PCAO, which was prosecuting Troxel's case. Nor did the MCAO appear in, or associate with, Troxel's case. Moreover, our decision in *Pratt* did not hold that a judge's mere negotiation for future employment created the appearance of partiality. Rather, we held that the facts of *Pratt* were "problematic . . . because . . . the judge was *actually retained* by the prosecuting authority." 813 N.W.2d at 878 (emphasis added).

Troxel also cites law review articles and other secondary sources to support the general propositions that prosecutors must "adopt the role of an advocate" for the government; that prosecutors "would be aligned . . . ideologically" with other prosecutors; and that an advocacy function is not "consistent with the neutral role" of a

21

judge. Although these propositions are not incorrect, they do not establish that negotiating to become a prosecutor *in the future* results in the appearance of a judge becoming an advocate, re-aligning his or her ideology, or departing from a neutral role. No precedent directly supports the argument that a judge is disqualified for an appearance of partiality based solely on employment negotiations with a county attorney's office when that office is outside the county in which the trial proceeds, that office is not appearing before the judge, and there are no indications that the office has had any involvement or interest in the case.[4] Here, Judge Aandal took all necessary steps to avoid

---

[4] The dissent contends that a reasonable examiner would question Judge Aandal's impartiality because both the MCAO and PCAO prosecute criminal cases "on behalf of the State" and because "the State" was the party appearing before Judge Aandal in Troxel's case. Thus, the dissent contends, Judge Aandal should have recused "from all other criminal cases . . . in which the State was a party." Under the effect of this broad rule, if a judge seeks employment with *any* prosecutorial entity in the entire State of Minnesota, that judge would be required to recuse from *all* criminal cases, regardless of the circumstances, because all criminal cases are prosecuted on behalf of "the State." This overly broad application of Rule 2.11(A) is not directly supported by any of our precedent, and in particular, it is inconsistent with *Jacobs*, in which we held that an appearance of partiality did not arise in a criminal case based on the employment of a judge's spouse, who worked for "the State" through the HCAO, because the HCAO handled a *high volume* and a *wide variety* of cases; the spouse had no involvement or financial interest in the outcome of the case; and the spouse did not work for the criminal appellate division of the HCAO at the time of trial. 802 N.W.2d at 753. Similarly here, the State of Minnesota handles a high volume and wide variety of cases and the MCAO had no involvement or interest in the outcome of Troxel's case.

Moreover, the dissent's bright-line rule, requiring recusal from *all criminal cases* in the State of Minnesota if a judge seeks prosecutorial employment, is inconsistent with our standard for evaluating an appearance of partiality, which depends on an objective examination of *all facts and circumstances* of each particular case. *Jacobs*, 802 N.W.2d at 752 ("Whether a judge's impartiality may reasonably be questioned is determined by an objective examination into the circumstances surrounding the removal request."). Here, the objective examination of all facts and circumstances related to Troxel's

(Footnote continued on next page.)

an appearance of partiality by ordering his own recusal from any cases involving the MCAO.

Despite Troxel's assertions that neighboring counties sometimes cooperate, or share resources and services, the Chief Judge of the Ninth Judicial District found that there is no evidence that the MCAO had "any interest in this case or that the outcome would have an effect upon Judge Aandal's future employment plans" or that the MCAO "ha[d] any involvement in [Troxel's] case." These findings are supported by the record. Moreover, Troxel has failed to rebut the presumption that Judge Aandal approached "every aspect of [Troxel's] case with a neutral and objective disposition." *See Jacobs*, 802 N.W.2d at 754 (quoting *Dorsey*, 701 N.W.2d at 247). For these reasons, a

---

(Footnote continued from previous page.)
removal request leads us to conclude that a reasonable examiner, who is fully informed of those facts and circumstances, would not question Judge Aandal's impartiality. *See also id.* at 753 ("[T]he appropriate standard for determining whether a judge must be disqualified due to an appearance of partiality is whether a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality.").

In response, the dissent contends that "this case is not *Jacobs*" and cites three factual differences. Nonetheless, other similarities with *Jacobs* and distinctions from *Pratt* support our decision. In *Pratt*, the facts were problematic because the judge was *actually retained* by the prosecutorial office that appeared before the judge. 813 N.W.2d at 878. But here, Judge Aandal negotiated for *future* employment with a *different* office from the one appearing before him. Moreover, in *Jacobs* we recognized the significance of different prosecutorial offices and divisions when we stated that, although the judge's spouse had worked as an attorney in the criminal division of the HCAO—the office appearing before the judge—the spouse's affiliation became less problematic when she transferred to a separate division of the HCAO before the case was filed. *Jacobs*, 802 N.W.2d at 753 & n.1. Here, the distinction is even greater because Judge Aandal never negotiated to join, let alone worked for, *any division* of the PCAO. Rather, he negotiated to work in the future for a different office, the MCAO. And, as we conclude above, there is no indication that the MCAO had any involvement or interest in this case.

reasonable and objective examiner, with full knowledge of the above facts and circumstances, would not question Judge Aandal's impartiality. Therefore, Judge Aandal was not disqualified under Rule 2.11(A) of the Code of Judicial Conduct.

V.

For the foregoing reasons, we affirm the postconviction court's denial of relief on all grounds.

Affirmed.

DISSENT

LILLEHAUG, Justice (dissenting).

I join Parts I, II, and III of the opinion of the court, but I respectfully disagree with Parts IV and V. The district court judge should not have presided over this first-degree murder case brought by the State of Minnesota at the time when he was actively negotiating to become a county attorney whose duties included prosecuting on behalf of the State. That he did so created an appearance that he lacked impartiality. To maintain public confidence in Minnesota's judiciary, I would reverse and remand for a new trial.

I.

The threshold question is whether the issue of the district court judge's disqualification is properly before our court. The defendant, Jedidiah Dean Troxel, moved to disqualify the judge. The motion was denied by the chief judge of the judicial district. Troxel sought a writ of prohibition from the court of appeals and moved the district court to continue the trial pending decision on the petition. The district court judge denied the motion for a continuance and, the next day, began the jury trial. Three days later, in the middle of trial, the court of appeals denied the petition. Troxel did not petition our court for expedited review or ask us to halt the trial.

The State contends that, by failing to petition for review, Troxel forfeited the issue of disqualification.[1] The court's opinion avoids resolving this contention and, instead,

_____

[1] The State also argues that the disqualification issue is barred by the doctrine of collateral estoppel. Collateral estoppel "precludes parties from relitigating issues which are identical to issues previously litigated and which were necessary and essential to the

(Footnote continued on next page.)

D-1

goes directly to the merits. I agree with the majority that we need not answer definitively whether, when a party chooses to petition for a writ of prohibition and the court of appeals denies the writ, the party must file a petition for review or be bound by the denial.

Nevertheless, without proposing a general rule of law, my view is that, in the extenuating circumstances of this case, Troxel did not forfeit the disqualification issue. In *State v. Finch*, 865 N.W.2d 696 (Minn. 2015), we allowed a defendant to pursue judicial disqualification on appeal from an order revoking probation, rather than seek an immediate writ of prohibition, because the defendant's probation revocation proceeding started almost immediately after his motion for disqualification was denied. We noted that "Finch did not have time to seek review after his motion was denied." *Id*. at 702. The circumstances here are similar. While Troxel's petition for a writ was pending, the district court judge denied Troxel's motion for a continuance and, the next day, began the jury trial. Trial was well underway when the court of appeals denied the petition.

In light of this unusual chronology, I would not hold against Troxel that he did not, in the middle of a jury trial, seek expedited review and an order to halt the trial. To so hold would not be in the "interest of justice." *See* Minn. R. Civ. App. P. 103.04;

---

(Footnote continued from previous page.)
former resulting judgment." *Aufderhar v. Data Dispatch, Inc.*, 452 N.W.2d 648, 650 (Minn. 1990). But the doctrine is inapplicable because there is no former judgment here. This matter is before the court on Troxel's appeal from the judgment in *this* case. True, this is a petition for postconviction relief in lieu of a direct appeal, but postconviction proceedings and appeals are part of the same case as the trial. *Hooper v. State*, 680 N.W.2d 89, 92 (Minn. 2004).

Minn. R. Crim. P. 28.02, subd. 11.  Further, the parties have fully briefed the question of disqualification, *see In re Welfare of S.L.J.*, 782 N.W.2d 549, 554 (Minn. 2010) (noting the fact that "both parties have fully briefed the question" militates in favor of review notwithstanding a party's failure to immediately appeal from an earlier order), and the opinion of the court decides it.

Accordingly, I must now turn to the question of whether the district court judge was disqualified.

## II.

The public's faith and confidence is critically important to our criminal justice system.  Rule 1.2, cmt. 3, Minnesota Code of Judicial Conduct.  Accordingly, judges must avoid both actual impropriety and the appearance of impropriety.  *Id.*, Rule 1.2. Under Rule 2.11(A) of the Code of Judicial Conduct, a judge is disqualified in any proceeding "in which the judge's impartiality might reasonably be questioned."  A judge is disqualified "due to an appearance of partiality" if a "reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality."  *In re Jacobs*, 802 N.W.2d 748, 753 (Minn. 2011).[2]  As we recognized in *State v. Pratt*, under the Code, "impartiality" means "the absence of bias or prejudice in favor of, or against, particular parties or classes of parties . . ."  813 N.W.2d 868, 876 (Minn. 2012). Whether a judge is disqualified presents a question of law, which we review de novo.  *Id.*

---

[2]    The "reasonable examiner" is not an attorney or a judge.  It is "an objective, unbiased layperson with full knowledge of the facts and circumstances."  *Id*.

Applying this standard, the issue is whether a reasonable examiner would question this district court judge's ability to be impartial. The answer to this question is "yes" because this judge created at least the appearance of partiality in favor of one of the parties in this case: the State.

Here, the parties are identified in the case caption: *State of Minnesota v. Jedidiah Dean Troxel*. The State was a party. The Minnesota Attorney General and the Pennington County Attorney were attorneys representing, and prosecuting on behalf of, the State.

It is worth recognizing that the district court judge was concerned about the appearance of impropriety here, disclosed his negotiations to become the Marshall County Attorney, and properly recused from cases involving that office. But, critically, he did not recuse from other criminal cases, including this one, in which the State was a party.

By continuing to preside over criminal cases in which the State was a party, while actively negotiating to become a county attorney—the advocate for the State in criminal cases—a reasonable examiner would question the judge's ability to be impartial. Put another way, a reasonable examiner would see that the judge was seeking to leave his position as umpire[3] in order to join one of the teams: the State. In fact, he did just that; he joined the State's team about two months after he sentenced Troxel.

---

[3]    As Chief Justice John Roberts famously explained: "Judges are like umpires. Umpires don't make the rules, they apply them. The role of an umpire and a judge is critical. They make sure everybody plays by the rules . . . ." *Confirmation Hearings on*

(Footnote continued on next page.)

But, responds the State, the district court judge sought to become the Marshall County Attorney, not the Pennington County Attorney. The two county attorneys, asserts the State, are "separate, and one has no control over the other." The court adopts this distinction between prosecuting offices.

However, the State and the court view the issue through too narrow a lens. The State, not a county attorney or the attorney general, was the real party in interest in the case before the district court judge. Whether the judge's hoped-for compensation would flow from county or state coffers, the judge was working actively to secure employment that included representing *the very party* in the case then before him: the State.

Further, we would be myopic if we failed to see the structure of the relationships between and among the county attorneys and the attorney general. The State is their client in common. They share a mission: to prosecute violations of the state criminal code. They work closely with the State's Bureau of Criminal Apprehension.[4] All county attorneys and the attorney general are members of the statutorily-created "council" known as the Minnesota County Attorneys Association. Minn. Stat. § 388.19 (2014).[5]

_____

(Footnote continued from previous page.)
*the Nomination of John G. Roberts, Jr. to be Chief Justice of the United States Before the Senate Comm. on the Judiciary*, 109th Cong. 55 (2005).

[4]     Investigators from the Bemidji regional office of the BCA testified in this case. Both Pennington and Marshall are counties covered by the Bemidji regional office and the Roseau field office.

[5]     The MCAA trains county attorneys and their assistants. Minn. Stat. § 388.19, subd. 4(a). Further, the county attorneys speak with a unified voice through, for example, amicus briefs and comments on proposed rules of procedure.

Especially in greater Minnesota, the county attorneys and the attorney general work closely together in major criminal matters, handling each other's cases when faced with specific conflicts or heavy caseloads.[6] Indeed, in this case, both the trial and this appeal were handled primarily by the attorney general. A reasonable examiner would not view the county attorneys, or the attorney general, as "separate." Rather, a reasonable examiner would view them to be part of the same team.

The fact situation presented here—a judge presiding over a trial in which the State is a party at the same time the judge is negotiating to represent the State—is reminiscent of *Scott v. United States*, 559 A.2d 745 (D.C. 1989), which we cited favorably in *Pratt*, 813 N.W.2d at 877. In *Scott*, a District of Columbia Superior Court judge presided over a trial in which the United States was a party. *Id.* at 747. The government was represented by the United States Attorney. *Id.* At the same time the judge was presiding, he was negotiating for employment with the Department of Justice's Executive Office for United States Attorneys. *Id.* The position he sought—Assistant Director for the Debt Collection Staff—had little, if any, connection to the day-to-day trial work of the United States Attorney. *Id.* The job was managerial with no direct litigation control. *Id.*

Yet, said the District of Columbia Court of Appeals, the fact that the two components of a large cabinet department were separate as a practical matter did not solve the appearance problem: the judge was presiding over a criminal case prosecuted

---

[6] An example is a pending case in our court, *State v. Byron David Smith*, Nos. A14-0942, A15-0300. The Washington County Attorney was designated as Special Assistant Morrison County Attorney to prosecute a first-degree murder case.

by one component of the department while the judge was negotiating with another component. *Id.* at 750.

In the same vein, and considering all of the circumstances here, a reasonable examiner would reasonably question why this district court judge would preside over a criminal case prosecuted by the State during the very time the judge was negotiating for a job that would include prosecuting for the State in other criminal cases.[7] He should not have presided over this trial.

In so concluding, I acknowledge that Troxel has not proven any actual bias. Nor should my conclusion be read to impugn the reputation of the district court judge, who is now a county attorney. Rather, this is about our high standard of impartiality; judges must both be fair and appear to be fair. Rule 1.2, Code of Judicial Conduct. Our legal system can function "only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions." *Complaint Concerning Winton*, 350 N.W.2d 337, 340 (Minn. 1984). As we have said, "The administration of justice should be beyond all suspicion of possible favoritism. Where the ability of a judge to try a cause fairly and impartially is [reasonably] questioned, he should have no reluctance in

___

[7] I agree with the court that disqualification depends on all of the facts and circumstances of each case. Therefore, I disagree with the court that disqualification here would be inconsistent with *In re Jacobs*, 802 N.W.2d 748 (Minn. 2011), which involved a district court judge presiding over a case prosecuted by the employer of the judge's spouse. In *Jacobs*, there were three more degrees of separation: (1) the spouse (2) was not in the criminal division (3) and was an assistant county attorney. Indeed, we distinguished *Jacobs* in *Pratt*, 813 N.W.2d at 877: "Unlike *Jacobs*, here it was the judge himself . . . ." In this case, it was the judge himself. He was seeking to become a prosecutor—not as an assistant, but as the chief prosecutor of the county right next door. This case is not *Jacobs*.

stepping aside." *Jones v. Jones*, 242 Minn. 251, 264, 64 N.W.2d 508, 516 (1954).  The advice of the supreme court of a neighbor state is wise:  "judges should err on the side of caution by disqualifying themselves in cases raising close questions [regarding the appearance of partiality]."  *State ex rel. Heitkamp v. Family Life Servs., Inc.*, 616 N.W.2d 826, 844 (N.D. 2000).

III.

Because the district court judge should not have presided, I must next consider whether a reversal is required.  As we discussed in *Finch*, 865 N.W.2d at 705, we have not firmly decided whether a failure to disqualify for an apparent lack of impartiality is structural error or is subject to the three-factor test in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988), which we invoked in *Powell v. Anderson*, 660 N.W.2d 107, 120 (Minn. 2003).  Those three factors are (1) the risk of injustice to the parties, (2) the risk that denial of relief will produce injustice in other cases, and (3) the risk of undermining the public's confidence in the judicial process.  *Powell*, 660 N.W.2d at 121.

Although it is a close question, I conclude that, even applying the less-stringent three-factor test, reversal is appropriate here.  The risk of injustice to the parties is slight.  On the other hand, there is a risk that denying relief will produce injustice in other cases in which judges preside while negotiating their next jobs.  As we said in *Pratt*, which involved a presiding judge as an expert witness retained by the county attorney appearing before him, "reversing in this case will have prophylactic value."  813 N.W.2d at 878.  What tips the balance toward reversal is the third factor:  the public's confidence in the

judicial process is undermined when we do nothing in a criminal case over which a judge presided while seeking to represent one of the parties—the State—as a prosecutor. As the concurrence in *Pratt*, applying *Powell*, aptly noted: "The citizens of Minnesota rely on the court to be vigilant in making sure that all cases will be decided in accordance with the highest traditions of the judiciary." *Id.* at 879 (Dietzen, J., concurring).

The court should have reversed and remanded for a new trial, presided over by another judge. Therefore, I respectfully dissent.


GILDEA, Chief Justice (dissenting).

I join in the dissent of Justice Lillehaug.


ANDERSON, Justice (dissenting).

I join in the dissent of Justice Lillehaug.